297 So.2d 163

John W. POWELL

v.

STATE.

I Div. 377.

Court of Criminal Appeals of Alabama.

June 28, 1974.

David L. Barnett, Mobile, for appellant.

William J. Baxley, Atty. Gen. and Samuel A. Beatty, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Powell was convicted of rape and sentenced to twenty (20) years in the penitentiary. Counsel was appointed to represent him at trial and on this appeal. Upon being arraigned he pleaded not guilty.

Appellant is a black man. The prosecutrix was a young white woman. She was married and living with her husband in Prichard, Alabama, at the time of the offense. They had an eighteen-month old son. Her husband's hours of employment were eight a. m. to five p. m. The wife had a part-time job at a large department store in a shopping center in Mobile. She worked from five p. m. until nine o'clock p. m. The husband kept the baby during these hours. At 8:55 P.M. on April 7, 1972, prosecutrix called home and told her husband she was checking the cash register and would be home in a few minutes but she had to stop at another store to make a personal purchase. Her husband asked her to pick up some hamburgers for supper.

Prosecutrix drove to another store in the shopping center to buy a toothbrush. She got back in her car and had driven two blocks when appellant popped up in the back seat and put a pistol to her head and said, "Don't scream or I'll kill you." He instructed her to turn left at the next street. He still had the pistol at her head. After making the turn he told her to pull to the side of the street and stop. He reached over and opened the door on the driver's side and got out of the car. He told her to move over to the passenger side on the front seat. He got under the steering wheel and kept the pistol pointed at her. He told her to get down and to dare not lift her head up or he would shoot her. She begged him to let her go, "Just take the car and let me go." She was crying and kept begging him to let her go. Appellant said, "Don't you cry; I'll have to shoot. You make me nervous."

After driving some distance he told her, "When I make this corner, I want you to

raise your head and empty your purse as you raise your head." She emptied her purse and only had five dollars. He took the five dollars and protested that he needed more money. She told him that was all the money she had.

He drove in the driveway of an apartment house on a dead-end street and told her to get out. She was still crying and begging him to take the car and let her go. With the gun pointed at her he told her to be quiet or he would have to kill her. He threatened to kill her from the time he captured her. He made her get out of the car and walk into the apartment house. The house was dark. He carried her into a bedroom and turned the light on. He made her undress and get in bed. He undressed and put the pistol on a dresser by the bed and turned the light off. She got a good look at him while the light was on in the bedroom. He got in bed with her and while using profane and obscene language he raped her. He gratified his lust in a few minutes and heard someone come into the apartment. He turned the light back on and told her to put on her clothes and walk straight out of the house to the car with a smile on her face. He picked up the pistol and walked behind her through the house to the car. Another black man and black girl were in the livingroom and as they were leaving the man asked appellant what he was doing here and he said, "I'll check you later" and carried the prosecutrix to the car. He again drove her car. She was crying, distraught and hysterical and kept begging him to take the car and let her go now. He told her he was going to buy some cigarettes before he let her go. He drove around for awhile but did not buy any cigarettes. He finally stopped the car and told her if she went to the police he was going to kill her. He turned the car over to her and left on foot.

The prosecutrix drove home but she was in such an emotional state that she fell out of the car in the driveway without braking the car and turning off the ignition switch.

She was so much later getting home that her husband became apprehensive and was looking out the window as she came in the driveway. He could tell something was wrong and he rushed out to meet his wife. He stopped the forward movement of the car and killed the engine. He picked his wife up and she told him she had just been raped. He carried her in the house and called the Prichard Police Department. The police responded immediately and, after considerable difficulty communicating with the prosecutrix, finally got the story. They advised her husband to carry her to a doctor for sedation and other medical attention. Her family physician was called and he met her at the Mobile Infirmary. The doctor found her to be extremely upset, almost uncontrollable, and he had difficulty in conducting a vaginal examination but finally managed to do so. He did not find any lacerations or abrasions but did find some reddening at the entrance to her vagina. He sedated her and referred her to Dr. Walter Hogan, an obstetrician and gynecologist, for a more definitive examination the next morning.

She went to Dr. Hogan's office the next morning. Her appearance at the time was described by the doctor in these words:

"She was intensely overwrought emotionally, almost to the point of being unable, really, to contain herself. She was crying and sort of at her wits end."

The examination was described by the doctor as follows:

"The examination—the most important feature was a softening or a swelling of the tissues at the entrance of the vagina, which is referred to medically as macaration and which would reflect some traumatic experience, something you might not expect with normal marital endeavor. She also had smears that were submitted for sperm analysis which were reported as negative. Although, the historical information which was provided me was that she had douched the night prior.

There was material still left in the vagina, however, which was positive for an enzyme which was definite evidence for the presence of seminal fluid or that ejaculation had taken place.

In describing the term "traumatic experience", the doctor said:

"Traumatic implies—perhaps the findings there did not reflect what you might expect in a normal intercourse. Traumatic would be some evidence that the penetration was not necessarily normal."

The doctor gave her tranquilizers and sedatives. Since the prosecutrix was in the mid-cycle of her menstrual life, and was thus a candidate for conception, she was given hormone therapy to prevent ovulation.

In sum, the doctor concluded that the prosecutrix had been subjected to an abnormal intercourse—the penetration was not normal.

The police officers called prosecutrix at 2:00 A.M. on April 8, 1972, and requested her to come to headquarters and go with them to the place where the offense was committed. She and her husband went with the officers and she told them to turn on Luther Street which was the dead-end street. She pointed to the apartment where she was raped. The house number was 928. The prosecutrix had no trouble directing the officers to this place as she got the name of the street after appellant released the car to her and while she was driving away.

Subsequently the officers submitted to her 26 mug shots of different individuals and after viewing these photographs she unhesitatingly and unequivocally picked out mug shot number 11 as her assailant. Number 11 was and is the appellant. Based upon this positive identification the officers went to appellant's home and arrested him for rape.

When the officers arrived at 928 Luther Street they were admitted by another male occupant and went directly to appellant's bedroom. He was not in the bedroom but they located him in the bathroom which was adjacent thereto. He was clad in his underclothes. He was placed under arrest. The officers did not have a search warrant but they, nevertheless, searched the bedroom and found a smaller caliber pistol with white or pearl handle under the mattress of the bed precisely as described by the prosecutrix and carried the gun and appellant to police headquarters. At 4:00 A.M. the officers called the prosecutrix at home and told her appellant was in jail and requested that she return to headquarters to inspect the pistol. She positively identified the pistol appellant used to kidnap her, threaten her life, and forced her to have connection with him, and also identified him at the station house.

During the trial, appellant moved to suppress the introduction of the weapon on the ground of an illegal search and seizure and the motion was granted. After appellant was arrested the officers had ample time to have obtained a search warrant. The trial court, on motion, instructed the jury to disregard all testimony relating to the pistol. The state consented to this action.

The 26 mug shots, including number 11, were admitted in evidence without objection.

Appellant did not testify in his defense but the thrust of his defense was that he had been dating white girls and had dated the prosecutrix and that she willingly went to his apartment to engage in sexual intercourse with him on the night of April 7, 1972. He produced one witness, a black girl, who testified that at 9:15 P.M. on the night in question she saw appellant and the prosecutrix entering the Baseball Social Club in Prichard. She claimed she was coming out of the Harlem Club across the street as they were going into the Baseball Social Club. She said appellant was with a blond white girl and that she could identify the girl. She was asked to look in the

courtroom and see if the girl she saw that night was present. She viewed the courtroom and said she did not see the girl.

Another witness testified that she was once employed at the Baseball Social Club and that appellant was there most every night. He would make a telephone call and in fifteen or twenty minutes, a white girl would drive to the Club and pick up appellant and drive away. She was asked the year this occurred and replied that it was 1971.

Other black witnesses testified they saw appellant with a white girl on the night of the offense and did not observe anything out of the ordinary. They did not see her crying nor did she appear to be abnormal but on the contrary the girl appeared calm. We note here that the time these witnesses claim they saw appellant with a white woman on the night of the crime was so far at variance with the other credible evidence that it makes their testimony entirely suspect. No doubt it impressed the jury the same way.

Appellant's counsel made known to the court that he wanted to offer appellant as a witness but did not want him interrogated concerning a prior conviction for carnal knowledge of a girl over twelve and under sixteen years of age. Appellant contended that this offense does not involve moral turpitude, and could not be shown to reflect upon his credibility as a witness. After prolonged debate and argument, the court ruled that carnal knowledge was a crime involving moral turpitude and appellant declined to testify.

The purpose of Title 14, Section 399, Code of Alabama 1940, is to protect girls who are over the age of 12 years and under 16 by absolutely prohibiting intercourse with them, and this without regard to their reputation of chastity or their status in society. Martin v. State, 17 Ala.App. 73, 81 So. 851.

The punishment for the offense denounced by Title 14, Section 399, supra, ranges from two to ten years in the penitentiary, and is, thus, a felony.

Moral turpitude is defined as "anything done contrary to justice, honesty, principle, or good morals; an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow man, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." Moore v. State, 12 Ala.App. 243, 67 So. 789.

■ Carnal knowledge is a statutory crime and was unknown to the common law. Title 14, Sections 398 and 399, Code of Alabama, has the effect of changing and broadening the common law and they fix the public policy of this state with respect to the crime of rape and kindred offenses. While consent is a defense in rape cases it is absolutely no defense to prosecutions under our carnal knowledge statutes, supra. This court said in Owens v. State, 29 Ala.App. 53, 191 So. 899:

"A different rule applies in prosecutions for rape and kindred statutory offenses. If the female is over sixteen years of age she may consent, and if the intercourse is had with her consent it is not rape. If, however, the intercourse is had by force and against her will the offense is complete, and the defendant would be guilty of rape. If the female is under sixteen years of age and sexual intercourse is had, with or without the consent of the female, the statutory offense of carnal knowledge would be complete. The effect of the statutes, hereinabove cited, is to raise the age of consent and to fix a different punishment on convictions for rape and kindred statutory offenses where the intercourse is with the consent of the female, and she is of an age between twelve and sixteen years. If the intercourse is had by force and against the will of the female, there would be no reduction in the punishment."

■ The design and breadth of our carnal knowledge statutes are to protect

young girls of tender years from falling victims to the wiles, schemes, debasedness, and depravity of over-sexed men who use arts of flattery and other inducements to persuade them to surrender their most precious possession to the gratifications of men who have lost their moral values and think of nothing save their animal instincts regardless of specific intent on the part of an accused to carry forward by force the sexual act to completion, and regardless of consent or non-consent of the child. Smith v. State, 34 Ala.App. 45, 38 So.2d 341.

In our research we have not found, nor have we been cited to, an Alabama case holding that carnal knowledge is a crime involving moral turpitude.

In Bendel v. Nagle, Commissioner of Immigration, 9 Cir., 17 F.2d 719, which involved a deportation case, the Court of Appeals, 9th Circuit, said:

"The crime (carnal knowledge) of which appellant was convicted is usually classed as rape, the statute simply raising the common-law age of consent, and such a crime manifestly involves moral turpitude. * * *"

█ Adultery is a crime involving moral turpitude. It is certainly an act committed by two consenting adults. Norris v. State, 229 Ala. 226, 156 So. 556.

Adultery involves moral turpitude even though one act or occasional acts are not punishable under the law of this state. Smith v. State, 39 Ala. 554; Boice v. State, 10 Ala.App. 100, 65 So. 83; Lawson v. State, 33 Ala.App. 343, 33 So.2d 388; Wilson v. State, 34 Ala.App. 219, 39 So.2d 250.

If adultery is a crime involving moral turpitude which admittedly takes place between consenting adults, how much more compelling is the conclusion that carnal knowledge with a girl over twelve and under sixteen years of age (where consent is absolutely prohibited by law) is a crime involving moral turpitude?

█ In our view all sex crimes are heinous, infamous and reprehensible, and we entertain no hesitation in here and now declaring carnal knowledge to be a crime involving moral turpitude, and a conviction thereof is admissible in evidence as affecting the credibility of a party or witness. This was the conclusion of the trial court and we are in full accord.

Appellant claims error to a reversal in the action of the trial court in sustaining the state's objections to the following questions on the voir dire examination of the jury panel:

"I would like to know whether any member of this panel would believe the testimony or tend to believe the testimony of a police officer more than that of any other witness, just because of the fact that he was a police officer?"

"I would ask whether any member of this particular panel believes in the political doctrine of white supremacy?"

"Is there any member of this panel that would consider giving a higher penalty to the defendant in this case, a rape case, with a white complaining witness —would you consider—notwithstanding what the testimony in this case was at all, would you consider giving the defendant a higher penalty based on his race and on his race alone?"

The general qualifications directed to the jury panel do not appear in the record but at the request of appellant the trial court asked the panel the following questions:

"Are any of you or any members of your immediate family members of the Ku-Klux-Klan?"

"Would any of you be biased in any way or be in favor in any way of any witness's testimony just by virtue of the race of that particular witness?"

"Would a witness's race have any bearing on your consideration in assessing the weight and credibility you are to

give to that particular witness's testimony; either white or black?"

There were no responses from the jury panel to either of these three questions.

In Noah v. State, 38 Ala.App. 531, 89 So.2d 231, this court said:

"The rule in this state is that, the extent of the examination of prospective jurors upon their voir dire rests in the sound discretion of the trial court." (citing cases)

In Gholston v. State, 221 Ala. 556, 130 So. 69, the Supreme Court held that it was not error to refuse to interrogate the jury panel regarding whether the jury would give a Negro the same justice as a white.

There is no requirement that the court put questions framed by counsel to a jury. Brown v. State, 45 Ala.App. 391, 231 So.2d 167.

We find no abuse of the court's discretion in qualifying the jury in this case.

There was no error in overruling appellant's motion to exclude the state's evidence on the grounds of failure to prove a prima facie case and failure to prove the corpus delicti. This was an aggravated case of rape. The prosecutrix was a helpless victim kidnapped at gun point while alone in her own car. She was subjected to several death threats, forced to disrobe and get in bed, and had to submit to a forceful penetration by appellant against her will and over her protests, and was again threatened with death if she reported this horrible crime to the law officers.

This case came on for trial almost ten months after the prosecutrix's most unpleasant experience and she was still in such emotional and mental state that she was unable to control the flow of tears and on one occasion the trial had to be recessed for a period of time so that she could regain her composure.

We have diligently searched this record for errors, any error, injuriously affecting the substantial rights of appellant and have found none. Appellant was accorded a fair and impartial trial and that is all he was entitled to under the law.

Affirmed.

All the Judges concur.