452 So.2d 487 (1982)
Ervin EDWARDS, alias
v.
STATE.
1 Div. 335.
Court of Criminal Appeals of Alabama.
June 29, 1982.
Rehearing Denied August 24, 1982.
*489 Michael A. Figures and Merceria L. Ludgood, Mobile, for appellant.
*490 Charles A. Graddick, Atty. Gen. and Thomas R. Allison and Edward E. Carnes, Asst. Attys. Gen., for appellee.
DeCARLO, Judge.
The appellant was indicted by the Mobile County Grand Jury in October 1979 for the capital murder of Mobile police officer, Henry Booth, in violation of Ala.Code § 13-11-2(a)(5) (1975). A new trial pursuant to the decision of Beck v. State, 396 So.2d 645 (Ala.1981), was conducted and appellant was found guilty as charged.
After a separate hearing on aggravating and mitigating circumstances, the jury returned a verdict fixing appellant's punishment at death. The trial court weighed the aggravating and mitigating circumstances pursuant to Code § 13-11-3 and sentenced appellant to death. Afterwards, the trial court issued both oral and written findings of fact which enumerated the aggravating circumstances the trial court found sufficient to support the sentence of death.[1]
Mobile Police Officer William Noel testified that on August 14, 1979, he was patrolling the area adjoining Officer Booth's beat. Around 7:20 P.M. on August 14, Noel saw Booth at a local business answering a complaint. Noel had been assigned as a backup for Booth. Booth was investigating a complaint concerning an individual wanted on an outstanding warrant of arrest for misdemeanor assault with a gun. Information was radio dispatched to Officers Noel and Booth stating the name and telephone number of an individual who could assist them in locating the suspect. Noel had previously attempted to locate the same suspect, who at that time had been armed with a .45 caliber automatic pistol. The individual was the appellant. Noel testified that Booth was privy to all the above information.
Officers Noel and Booth proceeded to a residence located in the Plateau community of Mobile where they had been informed that they would find appellant. Both officers had a description of appellant as being in his early thirties, of medium build, having a bushy moustache, and wearing dull green work clothes. Noel arrived at the house immediately after Booth and was told by Booth that he had seen the suspect run into the house. With the consent of the residents, the officers searched the house but did not find the appellant. Shortly thereafter, both officers were dispatched to another location to answer an unrelated complaint. Later, Noel told Booth that he was going into town and Booth replied that he was going to continue looking for appellant. They parted company around 7:45 P.M.
Approximately five minutes later, Noel was dispatched to back up Booth. He had overheard the conversation between Booth and the dispatcher on his police radio and stated that Booth's transmission was hurried and rushed. It appeared to him that Booth was a little excited. About three to four minutes later, Noel arrived on the scene to find Officer Booth's patrol car's engine running, its headlights and blue lights on, and both left side doors open. He was directed to the body of Booth, lying in a pool of blood, in an alley between two houses. Noel testified that Officer Booth's gun, flashlight, and nightstick were not in his belt. He found the nightstick on the front seat of Booth's patrol car and the flashlight under it on the left side near the center post separating the doors. Noel stated that it was not yet dark when he arrived.
Noel testified that on August 14, neither he nor Booth had the outstanding warrant of arrest for appellant with them. However, the police dispatcher had informed them that it had been verified and was in the police records section. Noel testified that one cannot be arrested for a misdemeanor offense without having the arresting officer present the accused a warrant of arrest unless the crime is committed in the officer's presence.
Noel testified that the type of holster worn by Officer Booth had more safety features than a conventional holster. He *491 stated that to remove the service revolver one would have to use a "down-forward motion."
Nolan Curtis Martin testified that on August 13, 1979, he and appellant had a fight during which appellant pulled a gun on him. On the morning of August 14, Martin had issued a warrant of arrest for appellant at Mobile City Court. Later that evening, Martin called the Mobile Police Department to lodge another complaint against appellant. Shortly thereafter, he received a telephone call from a Mobile police officer inquiring of the whereabouts of appellant. Subsequent to Officer Booth's death, Martin received another telephone call from the Mobile police and afterwards, Officer Noel visited Martin and took a statement from him.
Michael Burrell testified that he was present during the altercation between Officer Booth and appellant which resulted in Booth's death. He stated that he and Dan Prince were in Prince's car leaving the home of Gwen James, who was Prince's girlfriend, when appellant walked up and asked Prince for a "ride on the highway." Appellant did not tell them where he wanted to go. Burrell left the front seat and entered the rear seat while appellant sat in the front. As Prince was exiting James' driveway, a police car arrived and stopped the car. Both Prince and Officer Booth exited their vehicles and talked. Officer Booth asked Prince for his driver's license and was placing him in the back seat of the patrol car when he and appellant got out of the car. He asked Prince who was with him and afterwards called to appellant and told him that he had a warrant for his arrest. Burrell stated that appellant asked to see the warrant but was never shown it. Officer Booth told appellant to come to him, stating, "Come here boy." Appellant refused, telling Booth to come to him. Appellant opened his jacket apparently to let Booth see that he was not armed. Appellant had offered to move Prince's car out of the street, but Officer Booth would not let him. Instead, Gwen James moved the car.
Subsequently, Officer Booth approached appellant, grabbed him, and took him to his patrol car. The two began to scuffle as Officer Booth attempted to put appellant in the car. It was only after appellant refused to get in the car that Officer Booth hit him with his flashlight. The scuffle continued and moved to the alley near James' house. The two began to fight over control of Officer Booth's service revolver, a .357 caliber Smith and Wesson, which the officer was attempting to remove from his holster. The two fell on the ground and Officer Booth told appellant to let go of the gun which appellant refused to do. Shortly thereafter the gun discharged. Burrell ran when the gun fired, and did not see anything further.
Gwendolyn James testified that she was visiting Stella Smith, a neighbor who lived across the street, when the patrol car stopped her boyfriend, Dan Prince. James stated that appellant resided about five houses away. She overheard the conversation concerning Prince's failure to have a driver's license. James said that when she began to move Prince's car, Burrell and appellant got out of the car. Appellant began to walk toward his house and away from Officer Booth. Booth called twice for appellant to come to him. Appellant was asked his name to which he replied, "Tater Bow." After James left Prince's car, she saw appellant and Officer Booth begin to fight and saw Booth hit appellant with his flashlight. James stated that prior to the fight, she heard Officer Booth call for assistance. James saw Booth attempting to remove his service revolver and holding appellant against the car. She stated that appellant "put his hand on top of [Officer Booth's] to try to ... hold it down in there." James did not see the gun drawn or fired although she heard it discharge when she ran from the scene.
Dan Prince testified that he remembered being stopped by Officer Booth on August 14. He recounted in substance the events surrounding the stopping of his car as had been done by the other State's witnesses. Prince stated that when appellant got out of his car, he did not walk away. He *492 stated that Booth told appellant he had a warrant for his arrest and appellant walked toward him. Booth had unstrapped his revolver while calling him. Prince stated that the two began to struggle as Booth attempted to place appellant in the rear of the patrol car. He stated that Booth knocked appellant to his knees with his flashlight. During the struggle the appellant was attempting to prevent Booth from drawing his revolver. He testified that appellant asked Booth not to hit him. Appellant was holding Booth's wrist as they struggled over the gun. Prince testified that Booth told appellant to "turn [the gun] loose." He stated that Booth fell on top of appellant but appellant used his legs to prop against a house wall and turn Booth over. Prince stated that at one point the gun was pointed at appellant's face, and when appellant shoved it out of his face it discharged. Afterwards, the appellant hesitated for a few moments, then fled. Prince stated he did not see appellant with the gun.
Mobile Police Officer Walter Pickett testified that around 8:00 A.M. on August 15, 1979, he received a telephone call from Officer Sammy Brown informing him that appellant was going to surrender. Subsequently he met Brown, two other police officers, and Virginia Bryant. Bryant had told the officers that appellant wanted to surrender and was to lead them to him. When the police arrived at the location where Bryant had said appellant would be found, appellant walked to Officer Pickett's car, knocked on the window and entered the right side passenger door. He turned Officer Booth's gun over to Pickett. After being handcuffed he was taken to the police station.
Due to the death of pathologist Dr. Edward Scott, his testimony given at appellant's preliminary hearing was read into evidence. Dr. Scott's testimony revealed that he performed an autopsy upon Officer Booth around 6:00 A.M. on August 15, 1979. He tracked the trajectory of the bullet noting that it entered Booth's skull travelling downward at a five degree angle. He stated that the wound was made from a relatively close distance. He testified that Booth died from the gunshot wound which caused severe brain damage.
Firearm and toolmark examiner Richard Carter testified to the peculiar characteristics of Officer Booth's service revolver, a Smith and Wesson .357 caliber pistol. He noted the many safety features of the gun and the two methods of firing it. One method was by cocking the hammer then squeezing the trigger, and the other was by simply squeezing the trigger. The former method requires three and one-quarter pounds of constant pressure exerted upon the trigger to fire the gun, while the latter requires nine pounds. It was Carter's opinion that the muzzle distance from Booth's head when the gun was fired was anywhere from nine inches to twenty-five to twenty-seven inches.
Department of Forensic Sciences pathologist Dr. Leroy Riddick was called as a witness to examine the findings of Mr. Carter in light of the information discovered by Dr. Scott. Dr. Riddick examined Officer Booth's hospital records including several x-rays. His examination produced the following conclusions: (1) the muzzle of the gun was no closer than nine inches and up to fourteen inches away from Booth when it was fired; (2) the bullet travelled through the victim's skull at a twenty degree downward trajectory; and (3) Booth could not have inflicted the wound upon himself. The latter opinion was based upon the physical measurements of Booth, the trajectory of the bullet, the closeness of the gun when fired, and the elasticity, flexibility, and structure of the skeleto-muscular system in the arm, wrist, and hand. Dr. Riddick testified that his conclusions did not take into account any intervening circumstances which could affect them. His testimony concluded the presentation of the State's case.
The defense called Alex Peoples, a resident of the neighborhood where the offense occurred. Peoples discussed the struggle between Booth and appellant. He added that when Booth was standing by his *493 patrol car, it appeared as if he had a piece of paper in his hand. Peoples stated that after the shooting, he saw appellant pick something off the ground and walk slowly away. He felt that appellant was merely defending himself.
Stella Smith testified that she witnessed the struggle between appellant and Officer Booth, and her testimony was in substance the same as other State's witnesses. She saw appellant in possession of a pistol after the shooting when he fled the scene. Smith was of the opinion that appellant was never the aggressor and that Booth shot himself after appellant had forced the gun toward him.
James Smith, husband of Stella Smith, testified that after Officer Booth had twice called appellant and gained his attention, Booth told appellant, "I got a warrant for your arrest." Smith testified that appellant said, "Show me the warrant," to which Booth replied, "I ain't got to show you no damn warrant, you are going to get in the car anyway." He stated that it was after appellant had pushed Booth's arm down that the gun fired.
Appellant offered two witnesses who testified to Booth's bad reputation in the community for violence and bloodthirstiness. One witness characterized him as a "police bully," stating that in June, 1976, Officer Booth had been fired from the police force.

I
Appellant contends that his jury was improperly selected. He asserts that Ala.Code § 12-16-120 (1975) (repealed by Act of May 27, 1981, No. 788, § 8, 1981 Ala.Acts. 1381 [effective January 1, 1982]), was violated in that his jury was not selected from a special venire and a copy of the indictment was not served upon him.
Section 12-16-120 is not applicable to appellant. Rather Ala.Code T. 14, § 543(11) (Appendix 1965) applies to a jury venire in capital cases in Mobile County. Title 14, § 543(11) was not repealed by the enactment of the 1975 Alabama Code recompilation. See Ala.Code § 1-1-10 (1975). Consequently, the selection of a special venire in a capital case is unnecessary in Mobile County. Title 14, § 543(5), supra.
Additionally, appellant was not entitled to have a copy of the indictment served upon him pursuant to § 12-16-120. Furthermore, at arraignment, appellant, represented by counsel, waived the reading of the indictment, pleaded not guilty, and was served with a copy of the indictment. Therefore, there is no violation of Article 1, § 7 of the 1901 Alabama Constitution.

II
It is proper for the trial court to qualify the jury veniremen as to whether "... they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or ... that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Witherspoon v. Illinois, 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 30 L.Ed.2d 776 (1968). This qualification does not deny appellant a jury representing a cross section of the community.
In the instant case, the trial court painstakingly questioned those veniremen who responded in the affirmative. Its procedure was very similar to that which transpired in Berard v. State, 402 So.2d 1044 (Ala.Cr.App.1980), reversed on other grounds on return to remand, 402 So.2d 1051 (Ala.Cr.App.1981).
It is clear that questions following the guidelines of Witherspoon propounded to the jury venire are proper in post-Beck capital cases. The jury has the option to fix the punishment of a defendant at something less than death. In fact, Beck makes it clear that the jury participates in the sentencing scheme. Id. at 660-64. See also Ala.Code § 12-16-152.
Thus we find that the trial court properly questioned the jury venire pursuant to the guidelines in Witherspoon.

*494 III
Appellant contends that the trial court erred in refusing to qualify the jury concerning racial prejudice.
The contention is based on one statement made by counsel while counsel was moving the trial court for individual voir dire of the venire. From the record:
"MR. FIGURES: Judge, we would like to have individual voir dire of the jury venire. We think it is a capital case, which received over the last couple years, an awful lot of publicity. Emotions run high in this community, and there's been some other incidents involving white policemen and black citizens, and we think we should have an opportunity subsequent to this that are unrelated, but which put in the general community, an atmosphere of which we think should be examined relative to racial prejudices and general feelings about police and defendants. And we think we should have an opportunity to examine jurors individually, or at the very least, in very small groups of three."
The trial court explained that it had never conducted individual voir dire and considered it "time-consuming." Further, the trial court made it clear that it "would receive any questions that would be propounded to the Court, and ... would take just about any question ..." which it would address to the jury venire. It also stated that after generally qualifying the jury venire, it would divide it into smaller panels for more selective questioning and, "... if we get into certain areas where we would want to have a more smaller group which we could proceed into, then I do that." The trial court also stated that, "Where we get into the area of where an individual is not sure of what the nature of the question is, or what the substance of the area is that he is being examined on, or if ... it is questionable with the Court whether or not he understands what he is saying, the, of course, I go into an individual colloquy with that particular prospective juror."
During the above colloquy appellant's counsel again asked the trial court to allow "individual voir dire" and intimated that "group voir dire" might be sufficient. Twice the trial court denied appellant's request for individual voir dire examination of the jury venire.
The record indicates that the primary point of appellant's motion was to secure a favorable ruling allowing individual voir dire. It is unclear whether the questioning would have been conducted by appellant or the trial court. Nevertheless, that was the trial court's understanding of appellant's motion, because it did not rule on whether to qualify the jury venire as to racial prejudice. However, the trial court made absolutely clear that it would ask "just about any question" submitted to it.
It is well settled that the trial court has the discretion regarding how the voir dire examination of the jury venire will be conducted, and reversal can only be predicated upon an abuse of that discretion. Ervin v. State, 399 So.2d 894 (Ala. Cr.App.), cert. denied, 399 So.2d 899 (Ala. 1981); Peoples v. State, 375 So.2d 561 (Ala. Cr.App.1979); Radford v. State, 348 So.2d 880 (Ala.Cr.App.1977); Johnson v. State, 335 So.2d 663 (Ala.Cr.App.), cert. denied, 335 So.2d 678 (Ala.1976). Appellant has the right to have questions formulated by him propounded to the jury venire, either by the trial court or his counsel as the trial court may determine. Griffin v. State, 383 So.2d 873 (Ala.Cr.App.), cert. denied, 383 So.2d 880 (Ala.1980); Witherspoon v. State, 356 So.2d 743 (Ala.Cr.App.1978); Holmes, supra; Johnson, supra. There is no requirement that the trial court put the question framed by counsel to the jury venire. This is a matter addressed to the trial court's discretion. Griffin, supra; Powell v. State, 53 Ala.App. 30, 297 So.2d 163 (1974). See also Calloway v. Lemley, 382 So.2d 540 (Ala.1980); Clark v. State, 294 Ala. 493, 318 So.2d 822 (1975).
Moreover, it is within the trial court's discretion to allow individual voir dire. Seals v. State, 282 Ala. 586, 213 So.2d 645 (1968); Aaron v. State, 273 Ala. *495 337, 139 So.2d 309 (1961); Witherspoon, supra; Johnson, supra; Johnson v. State, 43 Ala.App. 613, 197 So.2d 466 (1967). We find no abuse here.

IV
Appellant argues that "the trial court erred in empaneling thirteen jurors and then excusing one after the trial began."
After the jury had been struck, the trial court retained the last prospective juror struck by appellant for use in selecting an alternate under Ala.Code T. 14, § 543(13) (Appendix 1965). Appellant objected to the trial court's allowing the struck juror to remain on the jury. The court administered the oath to the jurors and told them that one of their members would be chosen as an alternate pursuant to Ala.Code T. 14, § 543(14) (Appendix 1965). Afterwards the jury was dismissed for lunch. The record indicates that appellant's counsel understood the trial court's previous ruling to mean that the juror he had struck would be the alternate rather than any of the remaining thirteen. The trial court clarified its position stating that the alternate would be selected pursuant to § 543(14), supra.
After the jury returned, a conference was held outside their presence and the trial court removed the juror appellant struck earlier. Appellant objected to his removal. Afterwards testimony was taken.
On one hand, appellant objected to the juror's placement on the jury and then, on the other, he objected to his discharge. Apparently, the trial court altered its previous ruling adverse to appellant and agreed with appellant's position that the juror could not sit as a juror or alternate. Thus, the trial court ultimately ruled in favor of appellant's initial position.
The use of an alternate juror under § 543(13), supra, is a discretionary matter left to the trial court. Apparently the judge ruled in appellant's favor in an attempt to protect his substantial rights. We find nothing in the trial court's rulings prejudicial to the appellant.

V.
Appellant claims that the trial court erred by granting the State's motion in limine. The motion sought to prevent appellant from inquiring into facts surrounding a disciplinary action taken against Officer Booth by the Mobile Police Department.
In our judgment, there was no error in granting the motion. While a murder victim's bad character for violence or like trait is relevant to the issue of self-defense, his character is provable only by evidence of reputation for the trait, Headley v. State, 51 Ala.App. 148, 283 So.2d 458 (1973), and not by specific acts. Huffman v. State, 360 So.2d 1038 (Ala.Cr.App.1977), affirmed, 360 So.2d 1045 (Ala.1978).
Officer Booth's general reputation for violence was, therefore, properly presented to the jury, but further inquiry into specific occurrences was correctly foreclosed by the trial court. We note, however, that the fact of Officer Booth's termination from the police force in June, 1976 was before the jury through the testimony of appellant's witness.

VI
The statute under which appellant was convicted, as construed by our Supreme Court in Beck v. State, supra, is constitutional. Daniel v. State, [Ms. 4 Div. 987, April 20, 1982] (Ala.Cr.App.1982); Clisby v. State, 456 So.2d 86 (Ala.Cr.App. 1982); Potts v. State, 426 So.2d 886 (Ala. Cr.App.1982). We find no error in appellant's prosecution under § 13-11-2(a)(5) as modified by Beck, supra. The trial court adhered to the trial and sentencing procedures outlined in Beck. Therefore, appellant's motions to dismiss and quash the indictment were properly denied.

VII
Appellant contends that the trial court erred in receiving a note from the jury *496 during its deliberation requesting additional instructions.
He raised this objection at his sentencing hearing held before the trial court through a "motion to set aside the verdict returned by the jury." We quote from the record:
"[O]n the basis that the jury, according to our understanding, and according to the information we had, according to a conference we had with the Judge in chambers, sent a handwritten note to the Court, to which the Court responded with a handwritten note, we presume, or we were not made privy to that note. All this took presence in the Judge's chambers, outside, not in open court. We have never seen that note, although, we asked your Honor to produce that note in chambers, and he has not done so. We would like to have that note produced and made a part of the record. The District Attorney was present at the time this took place, and I am sure his understanding, of course, is mine about the note that was written, because, as I recall, it was he who asked your Honor to see the note, which we still have not seen, and we think that that is very improper for the Court to be in communication of any form with the jury, outside the presence, not in open court, particularly with the note that we have never seen, and we would like to have the note produced and made part of the record. "So, on those bases, we would move the Court to set aside the verdict.
"THE COURT: I want to correct your statement, that the Court refused ... that you be allowed to see the note. And I want for the record, to reflect that you, at no time, were refused to see a note from a jury.
"MR. FIGURES: No, sir. If I said refused, then I misspoke myself.
"THE COURT: I want you to correct yourself now, then.
"MR. FIGURES: I don't think made that (unintelligible), I said we asked to see the note.
"THE COURT: And you said, the Court denied that request.
"MR. FIGURES: The Court did not produce the note, and still has not produced the note.
"THE COURT: The Court did not refuse to produce the note. The Court advised you, counsel, Senator Figures, that the note was returned to the jury, to be stated more clearly so that the Court could be apprised as to what the note was about.
"MR. FIGURES: Yes, sir.
"THE COURT: You were advised of that, and told in those same identical type words, that the note was confusing to the Court?
"MR. FIGURES: Yes, sir.
"THE COURT: And you didn't state that in your statement to the Court just now, and I want this for the record.
"MR. FIGURES: Yes, sir. We are aware of that, your Honor. We just think that note ...
"THE COURT: I am making my ruling, Senator.
"MR. FIGURES: Yes, sir.
"THE COURT: The note that was received by the Court was unintelligible. The note was sent back to the jury for the purpose of restating what they wanted to do in different words, or in a more clear fashion. They did that. That note was returned to the Court, and read to the jury in your presence.
"Each question was gone through word by word. And you heard the reading of the entire note before this Court. So, that aspect of your motion is erroneous and incorrect, now.
....
"MR. FIGURES: ... If your Honor will read him the note at the time he was talking to the jury, I was not aware of that. I don't recall your Honor mentioning the note in open Court at that time. And we would request that the note be produced and made a part of the record so that it might be reviewed on appeal.
"THE COURT: The note is a part of record, counsel, which is available to you,...
"MR. FIGURES: Yes, sir. Thank you.

*497 "THE COURT: ... and has been in the file since the note was received by the Court." (R. 605-608)
The trial court denied appellant's motion.
During the course of the jury's deliberation the record reveals the following:
"THE COURT: Mr. Galanos and members of the defense counsel, the jury has requested that I answer questions relating to certain aspects of the Court's charge. I am going to bring the jury out, and answer these four areas of which they have requested, a recovering of the law relating to certain aspects of my charge.
"MR. FIGURES: No, problem, your Honor, we would request that the defendant be brought in.

"THE COURT: All right. Bring in the jury.
(Defendant present.)
(Jury returned to jury box.)
"THE COURT: You may be seated, ladies. I have before me, a request by you, which is allowed by law for to, again, give you the charge as to the law relating to certain aspects. Now, in your request of me, you asked me to define, again, the terms, intentional and malice aforethought....
....
"You wanted to know the differences between Capital Murder, Second Degree Murder, First Degree Manslaughter and Second Degree Manslaughter. I will repeat those elements of each of those particular homicide offenses.
....
"The elements of self-defense was the third aspect of your question.
....
"Now, you have asked about the procedures relating to the law of the State of Alabama as it concerns the procedures where a defendant is charged with a Capital Felony.
....
"Have I answered your four questions?
"JURORS: Yes.
"THE COURT: You will now adjourn back to the jury room to commence your deliberation.
"(Jury dismissed back to the jury room to commence their deliberations. Jury not present.)
"THE COURT: Any exceptions by the State of Alabama?
"MR. GALANOS: Yes, sir. May we have one moment, please, sir?
"THE COURT: All right, let's go to the defense, and then we will come back to the State. Any exceptions by the defense?
"MR. FIGURES: No, sir, we don't have any exceptions." (Emphasis added)
It is clear that the trial court received a note from the jury requesting additional instructions. The note was unintelligible and the court returned it for clarification. At this point the jury clarified it either by correcting the original note or by drafting a new one. In any event, a note was again sent to the trial court who read the questions in open court and answered each. The note was made part of this record on appeal by appellant's motion to supplement the record. A.R.A.P. 10(f).
Although no communications should take place between the trial judge and jury after submission of the case to the jury, unless in open court with all parties and their attorneys present, all conversations between jurors and officers of the court do not amount to misconduct per se. A mere showing of such a communication does not raise the presumption that it improperly prejudiced the jury against the defendant. Donahoo v. State, 371 So.2d 75 (Ala.Cr.App.), cert. denied, 371 So.2d 79 (Ala.1979).
In the instant case, the only communication that occurred between the trial court and the jury was the trial court's receipt of the original note requesting additional instructions and its return indicating its unintelligible nature. The trial court did nothing more than what it would have done in the presence of appellant. Its additional instructions were given in open court *498 with appellant present, and without objection. Appellant suffered no prejudice to his substantial rights.

VIII
Appellant contends that the trial court erred in overruling his motion to exclude the evidence because the State did not establish a prima facie case.
We have carefully reviewed the State's evidence and find that the State sufficiently established a prima facie violation of § 13-11-2(a)(5). At the same time, we find that appellant established evidence of self-defense. Consequently, whether appellant committed the crime was in dispute, and the trial court properly submitted the evidence to the jury for its consideration. Where the evidence presented raises questions of fact, and such evidence, if believed, is sufficient to sustain the conviction, the denial of a motion to exclude the State's evidence is not error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Miles v. State, 257 Ala. 450, 59 So.2d 676 (1952).

IX
Appellant insists that the trial court erred in refusing to give several of his written requested charges. Appellant took no exception to the trial court's oral charge, but took exception to the refusal of his written requested charges.
Appellant specifically takes exception to refused charges 11, 12, 13, and 14. We have reviewed the remaining refused charges and find that they were either substantially covered by the trial court's oral charge, not predicated on the evidence, ungrammatical, confusing, abstract, erroneous or incomplete statements of law. Davis v. State, 401 So.2d 187 (Ala.Cr.App.), cert. denied, 401 So.2d 190 (Ala.1981); Travis v. State, 397 So.2d 256 (Ala.Cr.App.), cert. denied, 397 So.2d 265 (Ala.1981); Brown v. State, 392 So.2d 1248 (Ala.Cr. App.1980), cert. denied, 392 So.2d 1266 (Ala.1981); Ala.Code § 12-16-13 (1975).
Charges 11 and 13 were not properly predicated upon the evidence and were therefore, correctly refused. Shields v. State, 397 So.2d 184 (Ala.Cr.App.), cert. denied, 397 So.2d 189 (Ala.1981); Guy v. State, 395 So.2d 161 (Ala.Cr.App.1981).
Charges 12 and 14 are quoted below:
"CHARGE NO. 12
"If you believe from the evidence that Officer Henry Booth did not have a warrant with him at the time he met Ervin Edwards on August 14, 1979 and that he attempted to arrest Ervin Edwards for assault upon Nolan Martin with a gun then the court charges you that Officer Booth was attempting to put an illegal restraint on the liberty of Ervin Edwards and was attempting to make an illegal arrest.
"CHARGE NO. 14
"The court charges you that if you believe from the evidence that Ervin Edwards, the defendant in this case, requested Officer Henry Booth to show him a warrant and that Officer Booth did not do so, but tried to arrest Ervin Edwards, then Officer Booth was attempting to make an illegal arrest of Ervin Edwards."
Although the charges requested by appellant are correct statements of the law, see Ala.Code §§ 15-10-2, -3, -4 (1975), it was not error for the trial court to refuse them when they merely stated abstract principles of law without containing instructions as to their effect upon or application to the issues involved in the case. Craig v. State, 389 So.2d 177 (Ala.Cr.App. 1980); Bullard v. State, 369 So.2d 877 (Ala.Cr.App.1979); Simmons v. State, 368 So.2d 315 (Ala.Cr.App.1979). Such charges are abstract, Hudson v. State, 335 So.2d 208 (Ala.Cr.App.), cert. denied, 335 So.2d 211 (Ala.1976); Mitchell v. State, 38 Ala. App. 546, 89 So.2d 238 (1956); Noah v. State, 38 Ala.App. 531, 89 So.2d 231 (1956), and thus properly refused. Without more, the above charges, if given, would not have negated appellant's culpability.

X
The Supreme Court in Beck, supra, indicated the standards and procedures for *499 appellate review of capital felony cases. We have examined this case in light of those standards, and find that the crime was properly punishable by death, and that the sentence was appropriate in both its relation to the crime and to appellant. There were no accomplices with which to compare appellant's punishment. We have searched the record for error prejudicial to the substantial rights of appellant and have found none. The judgment of the Mobile Circuit Court is hereby affirmed.
AFFIRMED.
All the Judges concur.
 APPENDIX "A"
STATE OF ALABAMA, * IN THE CIRCUIT COURT OF
 Plaintiff, * MOBILE COUNTY, ALABAMA
vs. * CRIMINAL DIVISION
ERVIN EDWARDS, * CASE NO. CC79 1782
 Defendant. * CAPITAL FELONY
The Court, heretofore on the 21st day of September, 1981, having impaneled a jury of 12, for the trial of the above named Defendant under an indictment charging commission of a capital felony, to-wit: capital murder, wherein the victim, while acting in his official capacity as a law enforcement officer was intentionally killed; and,
Heretofore on to-wit: the 25th day of September, 1981, the jury having returned a verdict, "WE, THE JURY, FIND THE DEFENDANT GUILTY OF THE CAPITAL FELONY SET OUT IN THE INDICTMENT." LINDA K. PATTERSON, FOREWOMAN; and,
The Court having set the date for the Jury Sentencing hearing for September 26, 1981, and the jury having returned a verdict fixing the punishment for the Defendant at death by electrocution on the 26th day of September, 1981, and the Court having set, pursuant to law, the MITIGATION HEARING to be heard before the Court without a jury, to determine whether or not the Court should sentence the Defendant to death by electrocution, pursuant to the verdict of the jury, or to life imprisonment without parole;
And the Court having understood and considered the evidence presented at the trial of the Defendant on the indictment, and at the hearing before the Jury to determine the punishment, wherein the Jury fixed the punishment at death by electrocution, and having considered all of the matters presented in the MITIGATION HEARING on the 28th day of September, 1981, including the Pre-Sentence Report as amended, the Court makes the following Findings of Facts as required by law: 13-11-6 AGGRAVATING CIRCUMSTANCES
Aggravating circumstances shall be the following:
(1) The capital felony was committed by a person under sentence of imprisonment; RULING: NOT APPLICABLE.
(2) The Defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person. The pre-sentence investigation report of June 10, 1980 and as amended September 26, 1981, reflects three felony convictions and thirteen misdemeanor convictions. The defendant was convicted of the felony crime of "Assault with a Deadly Weapon" upon a prison officer while in the performance of his official duties, and sentenced to five years in the State Penitentiary. This offense was committed in the State Penitentiary upon a prison guard while the Defendant was serving a ten year sentence for Burglary in the Second Degree.
(3) The Defendant knowingly created a great risk of death to many persons; RULING: NOT APPLICABLE.
*500 (4) The capital felony was committed while the Defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, Rape, Robbery, Burglary or Kidnapping for ransom; RULING: NOT APPLICABLE.
(5) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. The evidence at trial of the Defendant reflected that a warrant had been sworn out against the Defendant for Assault with a Gun, wherein the deceased officer was attempting to execute said warrant by arresting the Defendant, at which time, the Defendant forcefully obtained the officer's revolver and killed him by shooting him in the head.
(6) The capital felony was committed for pecuniary gain; RULING: NOT APPLICABLE.
(7) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws. The police officer was killed while attempting to serve a warrant on the Defendant in the exercise of his official duty.
(8) The capital felony was especially heinous, attrocious or cruel. (Acts 1975, No. 213, 6.) RULING: NOT APPLICABLE. 13-11-7 MITIGATING CIRCUMSTANCES
Mitigating circumstances shall be the following:
(1) The Defendant has no significant history of prior criminal activity; RULING: NOT APPLICABLE

 CRIMINAL HISTORY  FBI NO. 719 630 B
ADULT RECORD:
PD Mobile, AL 9/10/54 Grand Larceny Circuit Court #17,759  Withdrawn
 and filed on
 6/29/60
PD Milford, DE 8/2/56 Disorderly Conduct Fined $13.50
State Board of Corrections Fugitive from Justice 10/16/56  Released on bail
Wilmington, DE 10/23/56
SO Everglades, FL 1/13/58 Investigation of Being Released 1/23/58
 Escaped Prisoner
State Board of Corrections Disorderly Conduct Sentenced 30 days Mandatory
Wilmington, DE 8/4/58 and 30 days Indefinite. $25
 fine and $4.50 cost. Released
 8/29/58
State Board of Corrections 1) Assault & Battery Sentenced 30 Days Mandatory
Wilmington, DE 9/11/58 and 50 Days Indefinite. $50
 fine and $4 cost.
 2) Escape Sentenced 3 months  Released
 1/30/59
State Board of Corrections Disorderly Conduct Sentenced 30 Days Mandatory
Wilmington, DE 7/8/59 and 30 Days Indefinite. $25
 fine and $4 cost. Paid fine
 and cost. Released 8/4/59
SO Fort Pierce, FL 12/25/59 Fugitive Warrant Released to U.S. Marshal
USM Miami, FL 12/28/59 U.F. A.P. (Burglary) Marshal Office could not locate
 record of arrest and disposition.
Department of Public Safety Fugitive, State of 3/17/60  Released to Delaware
Miami, FL 1/22/60 Delaware Authorities
PD Harrington, DE 3/18/60 Burglary, 4th Held indefinitely on $25 bail.
 Transferred to NCCI on
 6/24/60 (Intersystem  transfer)

*501
State Board of Corrections Breaking and Entering 2 years on 12/24/60  Released
Wilmington, DE 6/24/60 on 8/1/61
State Board of Corrections 1) Operating Motor Sentenced 30 Days Indefinite.
Wilmington, DE 11/1/61 Vehicle Without $50 fine and $3.50 cost.
 Owner's Consent
 2) Operating Motor Sentenced 30 Days Indefinite.
 Vehicle Without $25 fine and $3.50 cost.
 License
 3) Failure to Report Sentenced 20 Days Indefinite.
 Accident $20 fine and $3.50 cost.
 4) Leaving Scene of Sentenced 20 Days Indefinite.
 Accident $20 fine and $3.50 cost.
 5) Speeding Sentenced 45 Days Indefinite.
 $50 fine and $3.50 cost. Released
 3/8/62.
State Board of Corrections 1) Drunk and Sentenced 10 Days Indefinite.
Wilmington, DE 4/30/62 Disorderly $10 fine and $4 cost.
 2) Resisting Arrest Sentenced 30 Days Indefinite.
 $50 fine and $4 cost.
 3) Assault & Battery Sentenced 30 days definite.
 on Police Officer Fine $50 and $4 cost. Released
 6/26/62
PD Lakewood, NJ 12/16/62 Assault 12/17/62 Complaint Withdrawn
PD Fort Pierce, FL 5/18/63 Failure to Register as Nolle Prossed
 a Convicted Felon
SO Bay Minette, AL 6/20/64 Burglary, 2nd 10 Yrs. Penitentiary on
 10/21/64 (Case #4031) Completed
 sentence 12/22/72
State Board of Corrections Assault with Deadly 5 Yrs. Penitentiary on
Montgomery, AL 5/7/73 Weapon Upon Police 5/4/71 (Case #33) Completed
 Officer in Performance Sentence on 7/13/77
 of his Duties
PD Ocean Springs, Investigation of Released  No charge
MS 11/12/75 Burglary
PD Montgomery, AL 2/4/76 Burglary and Grand Nolle Prossed 5/25/77
 Larceny
PD Mobile, AL 7/23/78 Possession of Pistol Circuit Court #CC78 1883  Nolle
 After Conviction of Prossed 5/8/79
 Crime of Violence
PD Mobile, AL 9/27/78 Attempt Burglary Circuit Court #CC78 1707  on
 1/19/79 sentenced to 2 months
 County Jail. Credit for 33
 days served

(2) The victim was a participant in the Defendant's conduct or consented to the act; RULING: NOT APPLICABLE.
(3) The capital felony was committed while the Defendant was under the influence of extreme mental or emotional disturbance; RULING: NOT APPLICABLE.
(4) The Defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor; RULING: NOT APPLICABLE.
(5) The Defendant acted under extreme duress or under the substantial domination *502 of another person; RULING: NOT APPLICABLE.
(6) The capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; RULING: NOT APPLICABLE.
(7) The age of the Defendant at the time of the crime. (Acts 1975, No. 213, 7.) RULING: NOT APPLICABLE.
The Defendant was not limited to presenting only those potential mitigating factors enumerated in the relevant statute. The Court heard and duly considered defense testimony to the effect that the Defendant was (a) a model prisoner at Holman Prison and (b) a long-time acquaintance of and "good worker" for a former employer.
The Court, having thoroughly considered the aggravating circumstances and mitigating circumstances and having carefully weighed both, is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances far outweigh the mitigating circumstances and the jury having fixed the penalty of death by electrocution;
It is hereby ORDERED, ADJUDGED and DECREED that Ervin Edwards is guilty of the capital felony charged in the indictment. It is further ORDERED, ADJUDGED and DECREED that Ervin Edwards, suffer death by electrocution at any time before the hour of sunrise on the 28th day of December, 1981, inside the walls of the William C. Holman Unit of the State Prison System at Atmore, Alabama, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution.
It is further ORDERED, ADJUDGED and DECREED by the Court that the Warden of the William C. Holman Unit of the State Prison System at Atmore, Alabama, or in case of his death, disability or absence, the Deputy, or in the event of the death, disability or absence of both the Warden and his Deputy, the person appointed by the Commissioner of Corrections at any time before the hour of sunrise on the 28th day of December, 1981, inside the walls of the William C. Holman Unit of the State Prison System at Atmore, Alabama in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution, cause to pass through the body of Ervin Edwards, a current of electricity of such intensity to cause his death, and the continuance and application of such current through the body of the said Ervin Edwards, until the said Ervin Edwards be dead. May God have mercy on your soul.
It is further ORDERED, ADJUDGED and DECREED, that this sentence is hereby stayed, pending the appeal to the Appellate Courts of the State of Alabama, and the Court hereby directs the Court Reporter and the Clerk of the Court to prepare the transcript in accordance with law, and the Court hereby appoints Mr. Michael Figures, Mr. Walter Davis and Mr. Sam Irby, members of the Mobile Bar, to represent the said Ervin Edwards on the automatic appeal provided for in this cause.
It is further ORDERED, ADJUDGED and DECREED by the Court that the said Ervin Edwards be immediately transported to the William C. Holman Unit of the State Prison System at Atmore, Alabama, there to be held pending the determination of the appeal in this case.
ORDERED THIS THE 28TH DAY OF SEPTEMBER, 1981.
 /s/ Elwood L. Hogan
 ELWOOD L. HOGAN
 CIRCUIT JUDGE
 13TH JUDICIAL CIRCUIT

ON REHEARING
DeCARLO, Judge.
There is no need to determine whether Officer Booth's attempt to arrest appellant was legal. The alleged illegality of the arrest would not, as appellant seems to suggest, excuse the killing of Officer Booth. It is not an element of the capital crime that the officer be effectuating a legal arrest. The officer need only be "on *503 duty" when killed. Section 13-11-2(a)(5), Code 1975. Count I of the indictment alleges that appellant killed Booth "while the said Henry Booth was on duty as a member of the Mobile Police Department...." It is undisputed that Booth was on duty when he was killed. The general verdict returned by the jury goes to this count. Worrell v. State, 357 So.2d 373 (Ala.Cr. App.), cert. denied, 357 So.2d 378 (Ala. 1978).
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
All the Judges concur.
NOTES
[1] The trial judge's order setting the penalty is attached as Appendix A.