Appellant was indicted for the capital offense of murder during a robbery in the first degree in violation of § 13A-5-40
(a)(2), Code of Alabama 1975. After the jury returned a verdict of guilty, the trial court followed the jury's recommendation and sentenced appellant to life imprisonment without parole.
The state's evidence established that on the evening of February 4, 1982, Mr. Willie Ravizee and Ms. Fannie Bell Mack were at home in their trailer when someone knocked on the door. Ravizee opened the door and invited appellant inside. Thereupon, Ms. Mack excused herself and walked down the hall to the bathroom. She did not hear any conversation between Ravizee and appellant, but as she was coming back up the hall, a shot rang out. Armed with a rifle, appellant met her in the hall and said, "I done killed Bill, and I'm going to kill you if you don't give me all your money."
Ms. Mack went to her bedroom to get her purse and, as she was trying to get the money out, appellant grabbed the pocketbook and took the money himself. Ms. Mack testified that her purse contained over $200 at the time. Appellant also took three ladies' watches from Ms. Mack, jerked the telephone from the wall, and told her not to leave her home.
After appellant left, Ms. Mack went to the front of the trailer and found Willie Ravizee "sitting up in the chair dead." She stated that Ravizee's billfold was still full of cash and he still had his pocket watch after he was shot. When appellant was apprehended, he had nearly $200 concealed in his underwear and in his shoe, as well as three ladies watches on his person.
Appellant admitted being at the trailer of Ms. Mack and Mr. Ravizee on the evening in question, but he denied committing the offense with which he was charged. He stated that he normally kept money in his underwear.
 I
Appellant argues that his motion to dismiss the indictment, motions for judgment of acquittal, and requests for jury instructions should have been granted because the evidence did not prove a "murder by the defendant during a robbery," §13A-5-40 (a)(2). He contends that there may have been "a murder and a robbery but not a murder during a robbery," since Mr. Ravizee was neither robbed nor killed in the presence of Ms. Mack, and Ms. Mack, who was robbed, was not killed.
The capital offense for which appellant was indicted subsumes the following elements of robbery in the first degree as set out in § 13A-8-41, Code of Alabama 1975:
 "(a) A person commits the crime of robbery in the first degree if he violates section 13A-8-43 and he:
 "(1) Is armed with a deadly weapon or dangerous instrument; or
"(2) Causes serious physical injury to another.
Section 13A-8-43 provides:
 "(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:
 "(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
 "(2) Threatens the imminent use or force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property." *Page 130 
The testimony of Ms. Mack clearly established that she was the victim of a robbery in the first degree, i.e., that appellant, who was armed with a rifle, threatened her with the imminent use of force in order to acquire her property. The fact that Ms. Mack was not also the victim of the murder is immaterial under the current capital murder statute. "[Section]13A-5-40 (a)(2) is broader than § 13A-5-31 (a)(2) in that it encompasses a robbery-murder in which the person murdered is not the same as the victim of the robbery." Bush v. State,431 So.2d 563, 565 (Ala. 1983). See also Raines v. State,429 So.2d 1111, 1113 n. 1 (Ala. 1982); Carnes, Alabama's 1981 CapitalPunishment Statute, 42 Ala. Law. 456, 461-62 (1981).
The capital offense requires only that the murder occurduring a robbery, see § 13A-5-40 (a)(2) (emphasis added). The word "during" is defined in § 13A-5-39 (2) as follows:
 "(2) DURING. The term as used in section 13A-5-40 (a) means in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof." (emphasis added)
The term "during" was employed in the current statute in order to "close[ ] the[ ] loopholes" of the prior capital murder provision, which required the victim of the murder to be the victim of the underlying felony. Raines v. State, supra;Carnes, 42 Ala. Law. at 461.
In the present case, there was evidence from which the jury could reasonably have inferred that the murder of Willie Ravizee was done "in connection with" the robbery of Fannie Bell Mack. The fact-finders could easily have concluded that appellant shot Mr. Ravizee in order to effectuate or facilitate the robbery of Ms. Mack. That is, with her male companion out of the way, Ms. Mack became an easier target for robbery. Appellant, having shot Ravizee within the hearing of Ms. Mack, need not convince her further that he "meant business" and need not stay on the offensive against more than one person. It is our judgment, therefore, that Willie Ravizee was murdered "in connection" with a robbery within the meaning of § 13A-5-40
(a)(2).
 II
The admission of photographs of the deceased was not error. Showing as they did the character and location of the murder victim's wounds, they were "admissible as tending to prove a material issue, illustrate a relevant fact, and corroborate other evidence offered at trial." Godbolt v. State,429 So.2d 1131, 1134-35 (Ala.Cr.App. 1982); Hopkins v. State,429 So.2d 1146, 1157 (Ala.Cr.App. 1983), and cases cited therein.
 III
Appellant claims that the Alabama statutes for imposition of the death penalty are unconstitutional in that their application results in cruel and unusual punishment in violation of the Eighth Amendment, and because their definitions of aggravating and mitigating circumstances are arbitrarily applied in violation of the Equal Protection Clause of the Fourteenth Amendment.
Initially we note that, having received a sentence of life without parole rather than the death penalty, and having presented no evidence to substantiate his claim that the statute was unconstitutionally applied to him, appellant may not be heard to complain that the death penalty procedures of the statute are unconstitutional as applied to others. SeeUlster County Court v. Allen, 442 U.S. 140, 99 S.Ct. 2213,60 L.Ed.2d 777 (1979).
 "A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations. Broadrick v. Oklahoma, 413 U.S. 601, 610 *Page 131 
[93 S.Ct. 2908, 2914, 37 L.Ed.2d 830] (and cases cited)."
442 U.S. at 154-55, 99 S.Ct. at 2223.
 IV
Appellant insists that a rifle introduced as state's exhibit 14 was improperly admitted into evidence because Ms. Mack was not able to positively identify the gun, and because the criminalist who test-fired the weapon could not state with absolute certainty that the rifle was the same one which fired the fatal bullet. Instead, the criminalist testified as follows:
 "I can say [the bullet] came from a gun similar to this one, the same make and model. But I can't differentiate this particular gun from another gun of the same make and model. It could have been fired in this gun, but I cannot rule out other guns that are just like this one."
In view of the fact that the witness testified the murder weapon was the same or a similar rifle as state's exhibit 14, the gun was properly allowed in evidence, see Humphrey v.State, 370 So.2d 344, 347 (Ala.Cr.App. 1979); Means v. State,51 Ala. App. 8, 11, 282 So.2d 356, cert. denied, 291 Ala. 792,282 So.2d 359 (1973), with the jury entitled to give it whatever weight they deemed appropriate, see Williams v. State,384 So.2d 1205, 1211 (Ala.Cr.App. 1980).
 V
Prior to trial, appellant filed a "Motion to Prevent Death Qualification Voir Dire" questioning, in which he claimed that qualifying prospective jurors pursuant to Witherspoon v.Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), before the guilt phase of a bifurcated trial "prejudiced the Appellant and was not justified by any reasonable state interest." Brief of Appellant at 22.
Appellant's first contention is not supported by any evidence in the record that he was prejudiced. Appellant's second claim is answered by the Witherspoon opinion itself, in which the United States Supreme Court recognized that the state has an interest in identifying those jurors who are so opposed to capital punishment that "their attitude toward the death penalty would prevent them from making an impartial decision about the defendant's guilt." 391 U.S. at 522-23 n. 21,88 S.Ct. at 1777 n. 21 (emphasis in original).
In addition, the state has a reasonable interest in avoiding the delay and confusion which would result from death qualifying a jury after the guilt stage and prior to the sentencing stage. Because, under appellant's proposal, some of the guilt-phase jurors might have to be removed on Witherspoon
grounds, the sentencing-phase jurors who replaced them would not have heard the evidence admitted during the guilt phase. The repetitive and disoriented proof which might ensue would be intolerable. We therefore find appellant's argument untenable.
 VI
Finally, appellant maintains that prospective juror Jerimiah Belton was incorrectly excused for cause on Witherspoon
grounds. The record reveals the following exchange on voir dire:
 "MR. WATKINS [District Attorney]: Now, for everybody: Again, as I told you, we're talking about a capital case, and the State is going to be asking for the death penalty. So, I want you to all be thinking along the same lines when we start to strike this jury. Will all of you be willing to consider all the penalties provided by the State law and not be irrevocably committed before trial has begun to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of this trial?
 "What I'm asking you, Ladies and Gentlemen, is will you be able to have an open mind and return a penalty of death by electrocution if, in fact, the evidence is such that it could convince you of that, or would you be so irrevocably against the death penalty that you would not be able under any circumstances to render a *Page 132 
penalty of death? Is there anybody that would be irrevocably opposed to the death penalty to the extent that you could not render a death penalty if it was justified from the evidence?
"(No response.)
 "MR. WATKINS: I take it by your silence that everybody — Are you shaking your head? Would you be able to?
"PJ J. BELTON: I don't think so.
"MR. WATKINS: What's your name?
"PJ J. BELTON: Jerimiah Belton.
 "MR. WATKINS: Mr. Belton, you say you don't think you would be able to render a verdict that would require electrocution. Now, are you just irrevocably opposed to the death penalty? Is that your problem?
"PJ J. BELTON: Yes.
 "MR. WATKINS: You just don't believe in the death penalty?
"PJ J. BELTON: No.
 "MR. WATKINS: You're telling us that you would be irrevocably committed before the trial to vote against the penalty of death regardless of what the evidence is?
"PJ J. BELTON: To be fair with you.
 "MR. WATKINS: To be fair with me, you would be irrevocably committed to vote against the death penalty regardless of what the facts were?
"PJ J. BELTON: Yes.
"MR. WATKINS: This is Mr. Belton?
"PJ J. BELTON: Yes.
 "MR. WATKINS: I would ask that he be excused for cause.
"Has anybody else got a problem with it?
"(No response.)
 "MR. WATKINS: Mr. Belton, let me ask you this: Is your attitude toward the death penalty such that it would prevent you from making an impartial decision as to his guilt?
"PJ J. BELTON: Repeat that question.
 "MR. WATKINS: In other words, would you not be able to find him guilty if there was a chance that you were going to have to determine whether or not he was going to get the death penalty?
 "PJ J. BELTON: I think so if there was enough evidence.
 "MR. WATKINS: Are you saying if there's enough evidence, you can vote for the death penalty, or are you just saying you could vote him guilty but you could not under any circumstances vote the death penalty? Is that what you're saying to me?
"PJ J. BELTON: Right.
"MR. WATKINS: Judge —
 "THE COURT: Let me make sure I understand. Mr. Belton, is it your feelings because of deep convictions that no matter what the evidence or what the facts in any case, you could never vote for the death penalty?
"PJ J. BELTON: No.
 "THE COURT: You're not saying that. You're saying, then, that you could vote for the death penalty?
"MR. WATKINS: No. I think he's saying —
 "MR. TRAEGER [Defense Counsel]: Let him say what he thought, Your Honor.
"THE COURT: Let's have order in the court, please.
 "The question is: Some people and a good many people at various times are opposed to the death penalty. That's what we're asking you today. Do you have a deep conviction that no matter what the evidence, no matter what the testimony in any case you could never vote for the death penalty? Would you have that feeling before we even begin the trial of the case?
"PJ J. BELTON: Right.
"THE COURT: You do have that feeling?
"PJ J. BELTON: Yes."
In our judgment, Mr. Belton made it "unmistakably clear" that he would "automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case," Witherspoon v. Illinois,391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21, and was thus properly excused. *Page 133 
The judgment of the Greene Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.