477 So.2d 1365 (1984)
Frederick LYNN
v.
STATE.
4 Div. 183.
Court of Criminal Appeals of Alabama.
October 23, 1984.
Rehearing Denied February 12, 1985.
*1368 Donald J. McKinnon, Clayton, for appellant.
Charles A. Graddick, Atty. Gen., and William D. Little and P. David Bjurberg, Asst. Attys. Gen., for appellee.
TAYLOR, Judge.
Capital murder; sentence: death by electrocution. On April 3, 1983, the Barbour County Circuit Court affirmed an order of the Barbour County Juvenile Court which granted a prosecution motion that Frederick Lynn be tried in circuit court, as an adult, for the February 1981 capital murder of Mrs. Marie Driggers Smith. This court affirmed that decision. Lynn v. State, [Ms. 4 Div. 161, June 10, 1983] (Ala.Crim. App.1983).
At the conclusion of a three-day trial, a Barbour County jury convicted Lynn of the capital offense. Following the mandatory hearings and findings of facts, the trial court adopted the jury's recommendation and sentenced Lynn to death, pursuant to § 13A-5-45, et seq., Code of Alabama 1975. From that conviction and sentence, Lynn appeals.
*1369 The character of this appeal and the subject matter of the underlying trial necessitate our brief recital of the pertinent facts. At trial, the State's case in chief was largely dependent upon the testimony of Garrett Marcus Strong, appellant's admitted accomplice. Strong had previously pleaded guilty to robbery in connection with the incident and had been sentenced to thirty years' imprisonment.
The State's evidence tended to prove that during the late evening hours of February 5, 1981, appellant and his accomplice surreptitiously entered Mrs. Smith's home, located at 539 South Randolph Street in Eufaula, Alabama. Lynn entered the house through a window and then opened the back door for Strong to go in. When Lynn opened the back door for Strong, he was already holding Mrs. Smith at gunpoint.
The intruders then forced Mrs. Smith to sit in a chair in the middle of the house. Lynn removed the elderly woman's wristwatch and gave it to Strong. He then demanded to know where Mrs. Smith kept her money and jewelry. When she denied having anything of particular value in the house, appellant took off one of the gloves he was wearing and handed it to Strong, ordering him to search the other rooms of the house.
Strong's search netted only "a few coins and a ring." Lynn expressed his displeasure at the meager find by stating, "That ain't nothing." He then laid his sawed-off shotgun on the couch and conducted his own search of the house, while Strong stood over Mrs. Smith. When appellant went back into the room where Mrs. Smith was seated, "she broke for the door" in an attempt to escape. Lynn stopped her from leaving the house and dragged her back to the chair. He told her that if she tried to run again he was going to kill her.
Strong testified that at this point, appellant began "poking" and "sticking" Mrs. Smith with a knife and "cutting her across the hand." Lynn then told Strong to go into the other room and turn up the volume on the television. Strong went into the room where the television was and turned up the volume "as loud as it would go." He testified that it was while he was in the other room that he heard a gunshot. Strong stated at trial that he ran out of that room and through the room where Lynn was with Mrs. Smith on his way out of the house. He said that as he ran past them, Lynn was standing in front of Mrs. Smith holding the sawed-off shotgun.
This is a difficult case. The shocking cruelty of the crime itself is rivaled only by the fact that appellant was merely sixteen years of age at the time of the murder. In his appeal, Lynn presents numerous issues for our review.

I
Appellant first contends that the testimony of his admitted accomplice, Garrett Marcus Strong, was inadequately corroborated to sustain a guilty verdict. Lynn claims that the trial court erred in failing to render a judgment of acquittal.
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient." Ala.Code (1975), § 12-21-222. The procedure commonly employed for determining whether sufficient evidence exists to corroborate the testimony of an accomplice is a "subtraction process." Thompson v. State, 374 So.2d 388 (Ala.1979); McCoy v. State, 397 So.2d 577 (Ala.Crim.App.1981); Kimmons v. State, 343 So.2d 542 (Ala.Crim.App.1977). It consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense. Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973); Ware v. State, 409 So.2d 886 (Ala.Crim.App.1981) (emphasis supplied). The necessary quantum of corroborative evidence in such a case was addressed most recently in Scott *1370 v. State, 460 So.2d 1364 (Ala.Crim.App. 1983), reversed on other grounds, Ex parte Scott, 460 So.2d 1371 (Ala.1984). In Scott, the Alabama Supreme Court stated that the "corroborative evidence does not have to be very strong, or even sufficient to support a conviction, but merely must tend to link the accused with the offense," citing Miller v. State, supra (emphasis supplied). Our controlling authorities have consistently held that corroborative proof need merely tend to connect the defendant with the commission of the offense. See, e.g., Thompson v. State, supra; Miller v. State, supra; Sorrell v. State, 249 Ala. 292, 31 So.2d 82 (1947); Ross v. State 74 Ala. 532 (1883); Early v. State, 392 So.2d 548 (Ala.Crim.App.1980), cert. denied, Ex parte Early, 392 So.2d 551 (Ala.1981); Andrews v. State, 370 So.2d 320 (Ala.Crim. App.), cert. denied, Ex parte Andrews, 370 So.2d 323 (Ala.1979); Smith v. State, 45 Ala.App. 63, 223 So.2d 605 (1969); Moore v. State, 30 Ala.App. 304, 5 So.2d 644 (1941); Crumbley v. State, 26 Ala.App. 24, 152 So. 55 (1933).
Whether an accomplice's testimony is properly corroborated is a question of law for the trial court. Smith v. State, 230 Ala. 413, 161 So. 538 (1935); Reeves v. State, 34 Ala.App. 186, 38 So.2d 24 (1948). The duty of the court is to determine whether there is sufficient evidence which tends to connect the defendant with the commission of the crime, pursuant to the aforementioned test. Magouirk v. State, 49 Ala.App. 420, 272 So.2d 625 (1973); Miller v. State, supra; White v. State, 48 Ala.App. Ill, 262 So.2d 313 (1972). If such evidence indeed exists, the court must submit it to the jury. It is then the jury's role to determine the weight and sufficiency to be accorded such evidence. Luther v. State, 47 Ala.App. 647, 259 So.2d 857 (1972); Smothers v. State, 38 Ala.App. 153, 83 So.2d 374 (1954).
In the case at bar, the trial court concluded that sufficient evidence corroborating the accomplice's testimony existed, and submitted the case to the jury. We agree. Trial testimony of various persons put Lynn and Strong together both shortly before and shortly after the crime. Although the mere association of the youths on the evening of the crime is not sufficient evidence to warrant submission of the case to the jury, it was properly considered. In White v. State, 47 Ala.App. 282, 253 So.2d 351 (1971), this court held that the defendant's presence with the accomplices immediately before and after the time of the alleged burglary and the fact that he was riding in a car alleged to have left the scene of the burglary, taken with the lateness of the hour, was sufficient to connect the defendant with the crime and to submit the case to the jury.
The record further reveals testimony regarding Lynn's possession of a sawed-off shotgun on the night of the murder both before and immediately following the killing. Once again, taken alone, this element would fail to provide sufficient corroborative evidence to warrant submission of the case to the jury. However, it was properly considered by the trial court in determining whether sufficient corroboration existed to submit the case to the jury. Bridges v. State, 52 Ala.App. 546, 295 So.2d 266 (1974).
At trial, a mutual friend of Lynn and Strong, Terry Green, testified that on the afternoon of the day of the murder he had observed appellant putting the sawed-off shotgun down his pants leg. This was consistent with Strong's testimony regarding the manner in which Lynn concealed the weapon on the night of the murder. Lynn asserts on appeal that this evidence raises no inference other than his possession of a sawed-off shotgun. Taken alone, this assertion might be true. However, given the totality of the circumstances and the consistency of other corroborative evidence, the trial court was correct to consider this evidence in reaching its decision to send the case to the jury.
Appellant also challenges the corroborative value of the testimony of Herbert Bouier. At trial, Bouier testified that Lynn approached him on the day after the murder and asked him to help get rid of a gun.
*1371 Lynn's complaints regarding this testimony were more towards the sufficiency and weight of the evidence, rather than its corroborative worth. Consistent with the test for corroboration hereinabove set out, the trial court need only find that the evidence tends to connect the defendant with the crime. Appellant's desire to dispose of the weapon is tantamount to flight, which was held sufficiently corroborative in Freeman v. State, 41 Ala.App. 512, 138 So.2d 56 (1961).
On the whole, appellant's arguments as to this issue were related to weight of the evidence, rather than corroboration. It is within the jury's exclusive province to determine the weight and sufficiency to be accorded such evidence and not within the discretion of the court, unless the verdict is against the great weight of the evidence. Appellant's motion for judgment of acquittal was properly denied as to this ground.

II
Appellant next contends that the trial court erred to reversal in its jury instructions regarding corroboration of accomplice testimony. The record discloses that Lynn objected to that portion of the charge which states:
"The law says before you can consider the testimony of an accomplice there must be other evidence which not only tends to show the crime was committed but tends to show that the defendant is connected with it. The slightest corroboration of the testimony of the accomplice is sufficient if it tends to connect the defendant with a commission of the offense."
This passage, however, is but a small part of an expansive and detailed jury charge dealing with the corroboration of accomplice testimony issue. Following the objected-to statements, the trial court admonished the jury with the following language:
"I charge you, Ladies and Gentlemen of the Jury, that the corroboration necessary to support the testimony of an accomplice must be unequivocal and of a substantive character, must be of some fact or facts tending to prove the guilt of the defendant and which legitimately tends to connect the defendant with the crime, must be inconsistent with the innocence of the defendant, and must do more than raise a suspicion of guilt.
"....
"I charge you, Ladies and Gentlemen of the jury, that a conviction of a felony cannot be had on the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof is not sufficient. If you do not find that such corroboration exists to support the testimony of Garrett Marcus Strong, then you must find the defendant, Frederick Lynn, not guilty.
"I charge you, Ladies and Gentlemen of the Jury, that the corroboration of an accomplice is not sufficient if it merely shows the commission of an offense, or circumstances thereof, or that the accomplice and the defendant are acquainted or connected, but there must be independent evidence supporting the testimony of the accomplice or tending to confirm him which must be of substantial character, and must tend to connect the defendant with the commission of the crime charged or to identify him as the guilty person and which is inconsistent with his innocence. If you do not find that such corroboration exists to support the testimony of Garrett Marcus Strong, then you must find the defendant, Frederick Lynn, not guilty."
Considering the totality of the trial court's instructions to the jury, we find that any error arising from the use of the "slightest corroboration" language was corrected by the balance of the instructions on the issue of corroboration of accomplice testimony. Furthermore, although the "slightest corroboration" language is not found in the relevant cases, it is consistent with the language expressing the proper *1372 standards viz., that the corroborative evidence must "tend to link the accused with the offense." Scott v. State, supra; Miller v. State, supra.
The trial court's denial of appellant's motion for judgment of acquittal on this ground was correct.

III
Appellant asserts further error in the trial court's admission into evidence of State's exhibit 28, a sawed-off barrel portion of a 20-gauge shotgun. The actual murder weapon was never found and Lynn claims that there is no proof that the barrel admitted came from that shotgun. Appellant asserts that 20-gauge shotguns and 20-gauge shotgun shells are too common to link the barrel to the homicide and that it was, therefore, error to admit the barrel into evidence.
The exhibit in question was found in a search of appellant's residence on March 4, 1981, some four weeks following the murder. Another barrel portion of a shotgun was found during the same search. An expert witness for the State, Lonnie Ray Hardin, testified that the exhibit objected to came from a 20-gauge shotgun. He also testified that the slug removed from the body of Mrs. Smith was a 20-gauge shotgun slug.
Lynn challenges the relevancy of the evidence regarding the barrel, claiming that there was nothing to link it to the crime. He cites a line of appellate decisions in Alabama in which weapons were admitted, but distinguishes these cases from the one at bar by claiming that in those cases the weapon was specifically connected with the crime. The thrust of appellant's argument on this issue is that the exhibit is inadmissible because the barrel links him only to a 20-gauge shotgun and not to the 20-gauge shotgun that killed Marie Driggers Smith. We cannot agree.
The sawed-off barrel portion was obviously offered in evidence to raise the inference that it came from the murder weapon. We find this evidence was relevant. Other evidence also linked Lynn to possession of a shotgun that was "sawed-off at both ends."
Officer Dinkins testified that the "sawed off" barrel portion was found at the appellant's residence. Mr. Hardin testified that the barrel offered was of the same gauge as the slug which was removed from the victim's body. Terry Green testified that he observed appellant in possession of a sawed-off shotgun on the day and evening of the murder. Garrett Marcus Strong testified that Lynn had a sawed-off shotgun with him when he entered Mrs. Smith's house, and that after the fatal shot was fired, appellant was standing over the victim with a sawed-off shotgun in his hands. Herbert Bouier testified that the day following the murder, Frederick Lynn sought his help in disposing of a sawed-off shotgun. All of this evidence supports the inference that appellant was linked to the exhibit and that the exhibit was linked to the weapon he possessed on the day of the murder.
In Taylor v. State, 442 So.2d 128 (Ala. Crim.App.), cert. denied (Ala.1983), this court held that a gun was properly admitted into evidence even though the State's witnesses could not positively identify it as the murder weapon. In that case, a witness who saw the defendant with a rifle immediately after another person was shot could not positively identify the weapon at trial as the one she had seen the defendant holding. Also, an expert witness who testfired the weapon introduced at trial could not positively testify that it was the rifle that fired the fatal shot. The court held, however, that "In view of the fact that the witness testified the murder weapon was the same or a similar rifle as State's Exhibit 14, the gun was properly allowed in evidence...." 442 So.2d at 131, citing Humphrey v. State, 370 So.2d 344, 347 (Ala.Crim.App.1979); Means v. State, 51 Ala.App. 8, 11, 282 So.2d 356, cert. denied, 291 Ala. 792, 282 So.2d 359 (1973).
The same principles apply in the case at bar. Although there was no direct proof linking the exhibit to the murder weapon, *1373 there was sufficient foundation to support the inference that linked Lynn with the exhibit combined with the evidence tending to show Lynn in possession of a sawed-off shotgun in the victim's home on the night of the killing. There was, thus, ample relevancy to justify admission of the barrel "with the jury entitled to give it whatever weight they deemed appropriate." 442 So.2d at 131, Williams v. State, 384 So.2d 1205 (Ala.Crim.App.1980); Lackey v. State, 41 Ala.App. 46, 123 So.2d 186, cert. denied, 271 Ala. 699, 123 So.2d 191 (1960). The trial court did not err in denying appellant's motion for judgment of acquittal as to this ground.

IV
Lynn also contends that the trial court erred in allowing a State witness to give an opinion as to the distance between the weapon and the victim at the time of the fatal shot. Dr. Thomas Gilchrist, a duly qualified forensic pathologist, testified at trial that in his opinion, Mrs. Smith "died of a gunshot wound to the face." The prosecution then asked: "Were you able to determine whether this shotgun wound or the shotgun was discharged at close range or distant range from Mrs. Smith?" Appellant's counsel objected to this question on the grounds that a forensic pathologist was not qualified to render such an opinion. The trial court overruled the objection, stating, "He had already talked about the powder and other things. I think he has probably testified to enough facts already to give his opinion on that. I believe he is qualified from experience to do so." Dr. Gilchrist then testified that in his opinion, "the muzzle of the gun was relatively close to the face when it was discharged as evidenced by the deposition of powder on the neck and the stippling of the filler material on the face." Lynn contends on appeal that the trial court committed reversible error in allowing Dr. Gilchrist to give such an opinion over his objection.
In his brief, appellant relies on various Alabama cases to support his position that the witness should not have been allowed to state an opinion regarding the distance between the murder weapon and the victim. Lynn correctly cites Wise v. State, 11 Ala.App. 72, 66 So. 128 (1914), for the proposition that the mere fact that a witness is a physician does not establish his competency to testify as to how close a gun was to the deceased when the fatal shot was fired. In Wise, the court stated:
"The mere fact that the witness .... was a physician did not necessarily, of itself, without more, and when it was not made to appear that he had experience, show him to be qualified as an expert to give his opinion on how close the gun was to the deceased when the shot was fired, and the court committed no error in refusing to admit this evidence as competent expert opinion testimony." 11 Ala.App. at 83, 66 So. at 131-132.
The case at bar, however, is distinguishable from Wise. Dr. Gilchrist was qualified to testify not only as a doctor, but also as a forensic pathologist. It is common in cases such as this for the pathologist to be asked to estimate a range of distance from a gun to a shot victim when the shot was fired. Before he was asked to express his opinion on the range from which Mrs. Smith was shot, Dr. Gilchrist testified regarding his findings from a post-mortem examination he conducted on the body of the victim. He stated, inter alia, that his examination discovered "little black dots" or "stippling" on the backs of the hands and the face and neck of the victim. Dr. Gilchrist also testified that "there was some gunpowder laying on the neck."
As referred to in the statements made by the trial court in overruling Lynn's objection, Dr. Gilchrist testified that the stippling on the hands was "from either filler material or gunpowder striking the hands from the discharge," and that "on the face area there was stippling by filler material." The doctor clarified this point by testifying, without objection, that the filler material was "a white polyethylene material that is put into buckshot and shotgun slug shells around either the buckshot or the slug."
*1374 This testimony established a factual basis on which the witness based his opinion on the distance between the victim and the murder weapon. The trial court was satisfied that the practice and experience of the witness qualified him as an expert for the purposes of expressing such an opinion. The cases are clear that such learning may provide an adequate basis for expert testimony. See e.g., Radney v. State, 342 So.2d 942 (Ala.Crim.App.), cert. denied, Ex parte Radney, 342 So.2d 947 (Ala.1977). The decision of whether to accept a witness's testimony as that of an expert rests in the sound discretion of the trial court, and should not be disturbed on appeal but for palpable abuse. Gullatt v. State, 409 So.2d 466 (Ala.Crim.App.1982); Davis v. State, 352 So.2d 3 (Ala.Crim.App.), cert. denied, Ex parte Davis, 352 So.2d 8 (Ala. 1977). We find no evidence of any such abuse in the record. The trial court's admission of the testimony of Dr. Gilchrist regarding the distance between the murder weapon and the victim was not error.

V
Prior to calling Garrett Marcus Strong to testify, the prosecution made an oral motion in limine which was argued in chambers, outside the presence of the jury. The motion requested that counsel for the defendant be precluded from any inquiry into Strong's juvenile record. The trial court granted the motion, stating that such evidence was not admissible for impeachment purposes and instructing Lynn's lawyers not to mention Strong's juvenile record in any way. We combine our discussion of the two issues raised by the appellant in his contention that the trial court erred in granting the prosecution's motion.
Lynn asserts that the prosecution lacked proper standing to invoke the protective features of § 12-15-72, Code of Alabama 1975, on behalf of Garrett Marcus Strong. He claims that the protection afforded by the section is personal to a juvenile and, furthermore, not properly applied to a nonparty witness.
Section 12-15-72 states:
"(a) An order of disposition or other adjudication in proceedings under subsection (a) of section 12-15-30 shall not be considered to be a conviction or impose any civil disabilities ordinarily resulting from a conviction of a crime or operate to disqualify the child in any civil service application or appointment.
"(b) The disposition of a child and evidence given in a hearing in the court shall not be admissible as evidence against him in any case or proceeding in any other court whether before or after reaching majority, except in a disposition hearing in a juvenile court or in sentencing proceedings after conviction of a crime for the purpose of a presentence study and report."
Appellant construes this section and the remainder of the Juvenile Code as containing nothing "which specifically states that a juvenile conviction cannot later be utilized for purposes of impeaching a juvenile's testimony in a case where he is not a party."
There is no express statutory proscription of the use of prior juvenile adjudications for impeachment of a nonparty witness. The construction that Lynn urges upon the court, however, flies in the face of the philosophy underlying the juvenile adjudication process. The legislature intended the Juvenile Code to be a means of rehabilitation for those within its coverage, while protecting them from some of the penalties of the adult criminal justice system. Section 12-15-72 states that juvenile adjudications are not considered criminal convictions in the traditional sense. Children adjudicated under the Juvenile Code do not incur civil disabilities inherent with adult criminal convictions. Furthermore, and most importantly in this context, evidence of a juvenile adjudication is available for character proof only under the limited scope of post-conviction sentencing hearings or probationers' reports. To insist, therefore, that a juvenile record is *1375 admissible to impeach the testimony of a non-party juvenile witness is entirely inconsistent with the juvenile adjudication process.
The majority of the Alabama cases involving the application of § 12-15-72 and its forerunners dealt with the issue of admissibility of prior juvenile adjudications of a defendant in a subsequent criminal prosecution. See Thomas v. State, 403 So.2d 323 (Ala.Crim.App.1981); Daniels v. State, 375 So.2d 523 (Ala.Crim.App.1979); Moore v. State, 333 So.2d 165 (Ala.Crim.App. 1976); Love v. State, 36 Ala.App. 693, 63 So.2d 285 (1953); see also, C. Gamble, McElroy's Alabama Evidence, § 145.01(4) (Supp.1980). Recently, however, this court addressed an issue presented under another statute, yet which is identical in its reasoning and theory. In Hunt v. State, 453 So.2d 1083 (Ala.Crim.App.), cert. denied, Ex parte Hunt (Ala.1984), the trial court granted a prosecution motion in limine preventing the defense from impeaching a State witness by introduction of evidence of his prior adjudication as a youthful offender. This court expressly upheld the prosecution's standing to invoke the protective provisions of § 15-19-7(a), that section being substantially similar to § 12-15-72, which is controlling in the case at bar. The United States Supreme Court has recognized a State's interest in protecting and preserving the anonymity of a juvenile offender in Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). That same policy is applicable in the present case. The prosecution, therefore, had adequate standing to move the court to prohibit the defense from delving into Strong's juvenile record on cross-examination, and the court acted properly in granting the motion.
Lynn further seeks reversal of his conviction on constitutional grounds allegedly arising from the trial court's grant of the prosecution's motion in limine. Appellant contends that under the holding of the United States Supreme Court in Davis v. Alaska, supra, the present construction of the Alabama Juvenile Code which precludes cross-examination of a witness relative to his juvenile record violates both the Sixth Amendment of the United States Constitution and Article I, § 6, of the Alabama Constitution of 1901.
Both of these constitutional provisions guarantee a criminal defendant's right to confront witnesses against him. Appellant correctly states that Alabama courts have consistently held that right to include the right to cross-examination. Hembree v. City of Birmingham, 381 So.2d 664 (Ala. Crim.App.1980); Seay v. State, 390 So.2d 7 (Ala.Crim.App.1979), reversed on other grounds, 390 So.2d 11 (Ala.1980), cert. denied, 449 U.S. 1134, 101 S.Ct. 956, 67 L.Ed.2d 121 (1981). Lynn's reliance on Davis for the proposition that defendants should be permitted to cross-examine witnesses against them as to their juvenile records for impeachment purposes, however, is misplaced. The Davis decision simply does not so hold.
In Davis, the trial court granted the State's motion in limine precluding the defendant from attempting to show a State witness's bias by questioning him regarding his juvenile record. In reversing the conviction, the Supreme Court distinguished efforts to impeach generally from efforts to prove a witness's bias:
"Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing, the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence *1376 of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed towards revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is `always relevant as discrediting the witness and affecting the weight of his testimony.'
3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970)."
415 U.S. at 316, 94 S.Ct. at 1110.
The Court held, therefore, that because the questioning prohibited by the trial court's order sought to establish bias, rather than merely casting doubt on the witness's veracity by revealing his juvenile record, Davis's right to confrontation under the Sixth Amendment had been abridged.
Nothing in the record on appeal in the case sub judice indicates an intent by Lynn's lawyers to attempt to show any bias of Garrett Marcus Strong. In fact, in arguing the motion, defense counsel insisted that evidence of Strong's juvenile record "would go a long way ... towards destroying his credibility." It is our holding, therefore, that appellant's right to confront the witness was not violated and that the trial court acted properly in granting the State's motion in limine.
Finally, along constitutional lines, Lynn claims that the relevant Juvenile Code sections create "an arbitrary classification of defendants based not on the nature of their acts or history, but on nothing more than the ages of the prosecution witnesses when they were convicted of violations of the law." This argument has no merit. The rational basis for the statute rests in the State's indisputable interest in the welfare of its young people who have run afoul of the law. See Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971).

VI
During defense counsel's cross-examination of Garrett Marcus Strong, the trial court sustained a prosecution objection to a question relating to the witness's own character as being improper. Lynn asserts that this ruling was error, and that the question should have been allowed as being within the proper scope of cross-examination.
We agree with the trial court that the question was improper. Counsel asked, "Gary, don't you have a pretty bad reputation for telling the truth?" Such a question is obviously designed not for the value of the answer it elicits, but rather, simply to raise a suspicion of incredibility of the witness in the minds of jurors. Further, in Glass v. State, 147 Ala. 50, 41 So. 727, 729 (1906), the Alabama Supreme Court held that "a witness cannot be interrogated with respect to his own general character for truth and veracity." There was, therefore, no error by the trial court in sustaining the prosecution's objection to this question.

VII
Appellant strenuously argues several issues, the premises of which spring from the racial composition of the jury and other aspects of the jury selection process. Lynn claims that the trial court erred in denying his motion to prohibit the district attorney from using his peremptory strikes to exclude all blacks from serving on the jury. He asserts that "such a denial to a black defendant of the right to have members of his own race on the jury is clearly an arbitrary action of the State denying defendant ... equal protection under the law and due process as required by Amendment XIV of the United States Constitution."
Once again, the proposition that Lynn urges us to accept is plainly and simply not the law. Alabama courts have consistently held that it is not error for the prosecuting attorney to strike a jury on the basis of race. Robinson v. State, 428 So.2d 167 (Ala.Crim.App.1982), cert. denied, Ex parte *1377 Robinson (Ala.1983); Carpenter v. State, 404 So.2d 89 (Ala.Crim.App.1980), writ quashed, Ex parte Carpenter, 404 So.2d 100 (Ala.1981).
The standard by which such claims are judged was pronounced by the United States Supreme Court in a case originating in Talladega County, Alabama. In Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965), the Court held that in order for racially motivated jury selection to be constitutionally invalid, the defendant must prove that the State systematically used its peremptory strikes so as to preclude blacks from ever serving on juries. The record on appeal does not indicate that Lynn met this burden. In fact, the opposite is true. There was no error as to this ruling by the trial court.
Further related to the jury selection process, appellant claims that the trial court erred in denying his motion to be allowed two strikes for each strike the State received. Lynn claims that the crime for which he was charged was allegedly committed during 1981, at a time when Alabama law allowed the defendant two strikes for every strike of the prosecution. See Ala.Code (1975), § 12-16-122, repealed, 1982 Ala.Acts 82-221. He was not indicted until 1983. Effective January 1, 1982, the Alabama Code was amended to create a one-for-one strike situation; i.e., the prosecution is now allowed one strike for each strike of the defendant. See 1982 Ala.Acts 82-221 [now codified at Ala.Code § 12-16-100 (Supp.1983)].
Appellant claims that the trial court's denial of this motion subjected him to the operation of an ex post facto law, in violation of Art. I, § 9 of the United States Constitution and Art. I, §§ 7 and 22, of the Alabama Constitution of 1901. This court has previously addressed this precise issue in a similar context in Haynes v. State, 424 So.2d 669 (Ala.Crim.App.1982), cert. denied, Ex parte Haynes (Ala.1983). Relying on Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), and South v. State, 86 Ala. 617, 6 So. 52 (1889), the court held that "Section 12-16-100 as amended in 1982 by Acts 1982, No. 82-221, so as to give the State and the accused an equal number of strikes does not operate as an ex post facto law in prosecutions for offenses committed before the amendment." 424 So.2d at 672. We follow that holding and conclude that the trial court was correct in denying Lynn's motion for additional strikes.
Appellant's brief refers to the Voting Rights Act of 1965. Lynn asserts that § 12-16-100 is invalid because it was not "pre-screened" by the United States Justice Department as a statute "potentially affecting the political power of negroes." This line of argument is without merit. Repeal of the two-for-one strike rule had no effect upon the relative political power of black people in Alabama, nor any racial overtones.
Lynn further suggests that his due process and equal protection rights were violated by the trial court's refusal to allow a random "draw-down" of potential jurors. He claims that a random reduction of the pool of potential jurors to the statutory minimum of thirty-six would have increased the probability of blacks being on the jury by virtue of the black/white ratio in Barbour County, and that having a smaller pool would reduce the number of peremptory strikes available to the prosecution to strike blacks from the jury.
We have, hereinabove, resolved the issues of whether Lynn was entitled to have blacks on the jury, and whether the trial court erred in denying his motion to control the district attorney's use of peremptory strikes. This argument is merely an extension of those issues. As with them, we find no error in the actions of the trial court. Swain v. Alabama, supra.
Finally, with regard to the jury selection process, Lynn asserts that the trial court erred by granting the State challenges *1378 for cause to veniremen Hill and Thompson. Relying upon Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), appellant asserts that the trial court erred because it was not established that either of the prospective jurors would disregard the evidence and instructions of the court and vote against capital punishment regardless of the facts of the case.
Lynn appears to object to the specific language, or lack thereof, utilized by the trial court in its questioning of these veniremen on their biases against the death penalty. The trial court asked:
"Is your opposition to capital punishment such that you would automatically vote against capital punishment, regardless of what the evidence shows?" (Emphasis supplied).
Both veniremen answered affirmatively. We find such a question by the trial court to fulfill the Witherspoon requirements for determination of a venireman's bias against the death penalty. As the State points out in its brief, the Witherspoon court noted:
"Nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt."

391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21 (Emphasis original).
We, therefore, find no fault in the trial court's decision to excuse the two veniremen on the present case, given their unambiguous statements that they would automatically vote against the death penalty. See also, Ex parte Bracewell, 407 So.2d 845 (Ala.1979).

VIII
Appellant concludes his brief with a "Miscellaneous" section in which he gives summary treatment to several issues. We discuss, herein, only those which from the record merit serious consideration.
Without offering any new or unique arguments, Lynn asks this court to reconsider the constitutionality of the Alabama Death Penalty Statute. Appellant contends that the provision is per se unconstitutional. He also disputes the validity of the statute as it is applied in this case. Lynn concedes that he is unable to shed new light on the issue, but rather seeks review here only to preserve the matter for possible future appeals to State or Federal courts.
Lynn was indicted, tried, and convicted under the 1975 Alabama Death Penalty Statute as construed in Beck. Ala.Code (1975) § 13A-5-31 (Supp.1978). See also, Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); Beck v. Alabama, 396 So.2d 645 (Ala.1980); Colquitt, The Death Penalty Laws of Alabama, 33 Ala.L.Rev. 213 (1982). This construction of the statute has been consistently upheld for cases arising during the time between the United States Supreme Court's judgment in Beck, supra, and the July 1, 1981, effective date of the new Alabama Death Penalty Statute. Coulter v. State, 438 So.2d 336 (Ala.Crim.App.), aff'd, Ex parte Coulter, 438 So.2d 352 (Ala.1983); Edwards v. State, 452 So.2d 487 (Ala.Crim. App.1982), aff'd, 452 So.2d 508 (Ala.1984); Clisby v. State, 456 So.2d 86 (Ala.Crim. App.1982), aff'd, 456 So.2d 105 (Ala.1984); Magwood v. State, 426 So.2d 918 (Ala.Crim. App.1982), aff'd, Ex parte Magwood, 426 So.2d 929 (Ala.1983); Raines v. State, 429 So.2d 1104 (Ala.Crim.App.), aff'd, Ex parte Raines, 429 So.2d 1111 (Ala.1982). We follow this line of cases, and sustain the validity of the statute once again. Furthermore, we have searched the record for the alleged unconstitutional application of the provisions to this case. Finding no error, we conclude that the statute was correctly and properly applied below.
*1379 Appellant further complains that the trial court erred in denying his motion to allow E.H. Graves, Jr., an attorney retained by Lynn's family "to advise" them, to sit at the defense counsel table during the trial. The record, on appeal, clearly reflects two important points with respect to this allegation. First, the trial court appointed Donald J. McKinnon and Tommy Gaither as trial counsel for Lynn. Second, Mr. Graves informed the court that he had been retained "to advise" the family, and was not personal counsel to Lynn. It was, therefore, within the trial court's discretion to refuse to allow Graves to sit at the defense counsel table during the trial.
On two occasions during the testimony of Sergeant A. Gaston Tew, the trial court overruled defense objections to prosecution questions related to Sergeant Tew's trip to Spain to question witness Terry Green. Lynn asserts, on appeal, that these two questions were improper attempts to bolster the testimony of a yet uncalled witness: Terry Green. We disagree. Although the questions did relate to Green, they did nothing to enhance his credibility. Furthermore, Green was the reason for Tew's trip to Spain. There was no error in this regard.
Appellant asserts that admission into evidence of an out-of-scale drawing of Mrs. Smith's house was error. Charles F. Brooks, a State forensic scientist, testified that he made the drawing from his own observations, and although it was not drawn to scale, it was "made to show the locations of each room" in the house. We find that sufficient predicate was established to admit the drawing.
We also reject Lynn's claim that he "did not have a realistic opportunity to impeach" the testimony of Herbert Bouier. Appellant's point was that Bouier travelled from England to Alabama, at State expense, to testify. This fact, however, was established by cross-examination, and so was before the jury.
Lynn additionally asserts that Bouier's testimony was in contravention of a discovery order. The record contains a general motion regarding impeachment information on State witnesses which was, except for one portion, granted by the court. There is no indication that the testimony of Bouier violated the court's order, or that the remaining aspects of the motion were not met by the State.
Defense counsel had ample opportunity to impeach Bouier's testimony, and, in our estimation, conducted a thorough and revealing cross-examination. The witness's credibility was brought into question many times. There was no error as to this issue.
Appellant next contends that the trial court erred by refusing to give his requested jury charges numbered 1, 4, 5, 11, and 15. Our review of the record convinces us that the requested and denied instructions were fully and accurately covered by the court's oral charge to the jury. Campbell v. State, 423 So.2d 284 (Ala. Crim.App.), cert. denied, (Ala.1982).
A.R.A.P. 45A prescribes our scope of review in death cases.
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take the appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
We have followed this standard in the case at bar and have found no such error.
In addition, Beck v. State, 396 So.2d 645, at 664 (Ala.1980), requires a three-tiered analysis in death cases:
(1) Whether the crime was punishable by death;
(2) Whether similar crimes are being punished capitally throughout the State; and

*1380 (3) Whether the death sentence is appropriate in relation to the defendant.
In reviewing the instant case in light of the Beck requirements, we find the answer to each of these inquiries to be in the affirmative.
(1) Lynn was convicted of intentionally causing the death of Marie Driggers Smith by shooting her with a shotgun during the nighttime burglary of her home in violation of § 13A-5-31(a)(4), Code of Alabama (1975) (Blue Paperback Pamphlet 1978) (repealed 1981).[1] The offense is by statutory definition a capital offense.
(2) Similar crimes are being punished capitally throughout Alabama. See, e.g., Evans v. State, 361 So.2d 654 (Ala.Cr.App. 1977), affirmed in part, reversed in part, 361 So.2d 666 (Ala. 1978), cert denied, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979), on remand, Ritter v. State, 375 So.2d 266 (Ala.Cr.App.1978), affirmed, Ex parte Ritter, 375 So.2d 270 (Ala.1979), vacated, 448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1133 (1980); Bush v. State, 431 So.2d 555 (Ala.Cr.App.1982), affirmed, Ex parte Bush, 431 So.2d 563 (Ala.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983).
(3) We find the death sentence to be appropriate in relation to this defendant. The trial court's finding that only one aggravating, and one mitigating circumstance existed is correct. The aggravating factor arose inherently from the commission of the murder during the burglary, under § 13A-5-49(4) [formerly § 13-11-6(4)]. The single mitigating circumstance was "the age of the defendant at the time of the crime," under § 13A-5-51(7) [formerly § 13-11-7(7)].
We note that the trial judge took great care in analyzing these competing elements, evidencing substantial concern over the prospects of sentencing someone Lynn's age to death. In the final analysis, however, he determined that the mitigating circumstance was insufficient to outweigh the aggravating circumstance, and sentenced appellant to death.
In reviewing this sentence, we are bound by § 13A-5-53, Code of Alabama (1975). Subsection (b) of that provision requires that we review the propriety of the death sentence to determine:
"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
"(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
We determine that:
(1) there is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
(2) our independent weighing of the aggravating and mitigating circumstances in this case concurs with the findings of the trial court, and indicates that the death sentence was proper; and
(3) considering both the crime and the defendant, we find that the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases. This proportionality review is a requirement fostered under Alabama statute, and is not required for validity under the United States Constitution. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).
Our review of the record, in both the guilt and the sentencing phases of the trial, convinces us that no error exists. Accordingly, the judgment of the circuit court is due to be, and it hereby is, affirmed.
AFFIRMED.

*1381 APPENDIX

STATE OF ALABAMA, PLAINTIFF,

VS

FREDRICK LYNN, DEFENDANT.

CASE NO. CC-83-24

IN THE CIRCUIT COURT OF BARBOUR COUNTY, ALABAMA, EUFAULA DIVISION
FINDINGS OF FACTS CONCERNING CRIME AND DEFENDANT'S PARTICIPATION IN IT AND FINDINGS CONCERNING AGGRAVATING AND MITIGATING CIRCUMSTANCES
The above-styled case, coming on to be heard on Tuesday, May 24, 1983, and ending on Thursday, May 26, 1983, and from the evidence introduced into the trial of the case the Court makes the following findings of fact:
On February 6, 1981, the body of Marie Driggers Smith, an elderly white female, was found in her home located at 539 South Randolph Avenue in the City of Eufaula, Barbour County, Alabama. The first law enforcement officer to arrive on the scene, Capt. Ted Dotson with the Eufaula Police Department, determined that Mrs. Smith was dead and that because of the excessive amount of blood on her body and near her body and because of the ransacked condition of the house, he suspected foul play was involved. Law enforcement officers from the Alabama Bureau of Investigation and the State of Alabama Department of Forensic Sciences and the Barbour County District Attorneys Office were called to aid in the investigation of this crime. Drawers had been pulled out and the contents thereof strewn throughout the house. Attempts were made to lift fingerprints from all of these items. An autopsy was conducted on the body of the victim and the results revealed that the victim was killed by a shotgun wound to the face. Additional findings showed that the victim had superficial incise wounds at the left wrist and right hand. Examination of the portions of the shell that was found in the body of the victim revealed that the victim had been shot with a twenty gauge shot shell slug.
Gary Marcus Strong, an admitted accomplice to this crime, took the stand and testified for the State. Prior to testifying Strong had pled guilty to Burglary in the First Degree in connection with this crime and had been sentenced to thirty years in the penitentiary. Strong related that in September of 1982 he learned that his fingerprint had been found inside the victim's home and that he turned himself in shortly thereafter and gave a confession to his participation in this crime and implicated the defendant, Fredrick Lynn, as the trigger man. Strong testified that on Thursday, February 5, 1981, the defendant came to his house in Chattahoochee Courts at approximately 6:00 p.m. It was brought out that Chattahoochee Courts, a predominantly black housing project for low-income families, is located approximately two blocks from the victim's residence. He testified further that he and the defendant left his home shortly after 6:00 and went to Hardee's to eat. After eating, Strong and Lynn went to Laurie Daniels' house, located in Chattahoochee Courts, where Terry Green was visiting. Strong testified that Lynn had told him that he had put a sawedoff shotgun in Terry Green's car and wanted to pick it up and take it somewhere to sell it. Strong accompanied Lynn to the Daniels' residence and there Lynn took the sawed-off shotgun out of the trunk of Terry Green's car. He testified that they left Chattahoochee Courts walking down Randolph Street in the direction of town and toward the victim's house. As they passed in front of the victim's house it was noted that a light in the front room went off and Fredrick Lynn told Strong, "Let's stop here and check this out". Strong then testified that a few moments later Fredrick Lynn took the screen off a window in the front portion of the house and raised the window and entered the house. At this time, Lynn told Strong to meet him at the back door. Strong proceeded to the back door and a few moments later Lynn opened it and told *1382 him to come inside. Strong testified that at this time Lynn had the sawed-off shotgun held on the victim. Strong testified further that Lynn ordered the victim into the center room of the house where he forced her to sit down in a chair. He then told Strong to search the rooms for valuables. Testimony further showed that at one point during the crime the victim attempted to escape out the front door only to be caught by Lynn who then began cutting her along her wrist with a knife. Strong also testified that it was at this time that Lynn told the victim that if she tried to escape again that he would kill her. Strong further testified that shortly after this he thought he heard a car or saw the headlights of a car outside the house and went to the back door to look. He didn't see anything and when he came back into the middle portion of the house Lynn told him to go and turn the television up very loud. Strong testified that he did so and after he had turned the volume up on the television he heard a gun shot and ran out of the house. He testified that as he ran out the back door he looked into the room where the defendant and victim were and the defendant was standing over the victim with the shotgun pointed at her. Strong testified that he ran home and hid the items that he had taken during the crime, these items included a wristwatch, a ring and some old coins. After doing this, Strong proceeded to a nightclub called the Casino Club where he met Fredrick Lynn and they joined Terry Green and Herbert Bouyer. At about closing time, 1:30 a.m., Strong testified that he, Lynn, Bouyer, and Green left the club together. He testified that he was taken to his house first and that he got out there to go home for the night. The defendant also got out at this point and went behind Strong's house and returned to Green's car with a sawed-off shotgun in his hand.
Investigator Earlie Dinkins of the Eufaula Police Department testified that he conducted a consent search of the residence of Mrs. Rencie Lynn on the Gammage Road, Eufaula, Alabama, on March 4, 1981. Mrs. Rencie Lynn is the grandmother of Fredrick Lynn and evidence showed that Fredrick Lynn was living with her at this address on March 4, 1981. During the search a sawed-off barrel from a twenty gauge shotgun was obtained from a trash can in the carport area of the house.
Terry Green, who is currently in the Air Force and stationed in Spain, testified that on February 5, 1981, he was a Senior at Eufaula High School and attended school that day. He testified that he received a message to pick up Fredrick Lynn at his grandmother's house after school and that he did so. The evidence revealed that Fredrick Lynn had a blue sweater with something wrapped in it when he came out of his house on February 5th, and got into Terry Green's car. The defendant got Green's keys and put the sweater and what was subsequently revealed to be the sawed-off shotgun in the trunk of the car. Green testified that later in the day he and the defendant went to the playground area of Chattahoochee Courts where the defendant got Green's keys, opened the trunk and got out the sawed-off shotgun and was showing it off to the people present at the playground. He also showed the people there that he had ammunition for the gun in his possession. Green testified that they stayed at the playground for approximately an hour and that he then went to visit his girlfriend, Laurie Daniels, at her residence. Before leaving the playground, Lynn wrapped the gun back in the sweater and placed it back in the trunk of Green's car. Green testified that later that evening, at approximately 8:00 p.m., Lynn came to Ms. Daniels' residence and got his car keys and went to the trunk. He testified that when Lynn brought the keys back to him after going to the trunk the defendant was wearing the blue sweater in which the shotgun had been wrapped earlier. Green further testified that at approximately 11:00 p.m. he left Ms. Daniels' residence. Before leaving, Green went to his trunk to get out a water bottle as he had a leaking radiator, and when he opened the trunk noted that the shotgun was not in the trunk. He testified that he went from Ms. Daniels' *1383 residence to Hardee's where he picked up Herbert Bouyer and from there they proceeded to the Casino Club. He testified that when he and Herbert Bouyer got to the Casino Club, Gary Strong and Fredrick Lynn were already there and that Lynn and Strong came over to where they were sitting and joined them at their table. Evidence revealed that the four left the Casino Club as it closed at approximately 1:30 a.m. and proceeded to Gary Strong's house. Green testified that Strong got out to go home at this time and that Lynn got out also and told Terry Green to wait for him as he had to go get something. He testified that he did not see where Lynn went or what he had with him when he came back. From there the evidence showed that Green next took Bouyer to his car which was at Hardee's. From there Green and the defendant went to the Omelet Shop and had something to eat and then proceeded to Gammage Road to take the defendant home. As the defendant got out of the car at his residence at Gammage Road, he reached under the seat of the car and pulled out the sawed-off shotgun and took it inside with him.
Herbert Bouyer, who is currently in the Air Force and stationed in England, testified that on February 6th, he went to Fredrick Lynn's residence to visit Mrs. Rencie Lynn and Fredrick. He testified that he had a conversation with Fredrick Lynn on this date at approximately 10:00 a.m. and that the subject of the conversation was a sawed-off shotgun, which Lynn showed to Bouyer that day. Bouyer testified that Lynn asked him to "take him somewhere to dispose of the gun", and that he refused to do so.
This synopsis of the evidence is the relevant facts that were admitted into evidence and upon which a jury found the defendant guilty of the capital offense as charged in the indictment and upon which the jury, in the sentencing portion of the trial, sentenced the defendant to death by electrocution.
The defendant, Fredrick Lynn, was tried under an indictment which charged him with the capital offense of nighttime burglary of an occupied dwelling when one of the occupants is intentionally killed by the defendant, Section 13-11-2(a)(4), Code of Alabama 1975.
Immediately upon receipt of the jury's verdict of guilty to such capital offense, the Court held a hearing before the same jury to allow the state and defendant to present further evidence of aggravating and mitigating circumstances and to present arguments for and against the imposition of the death penalty in this case. The state introduced the evidence taken during the guiltphase of the trial and argued for the death penalty. The defendant also offered the evidence taken upon the guilt-phase of the trial and offered the testimony of the defendant's mother and great aunt, showing the family life of the defendant and other childhood influences which might be relevant in the sentencing phase of the trial. After the state and defense had argued and the court had instructed the jury as to the law, the jury retired and, after deliberation, returned a verdict fixing the defendant's punishment at death.
The court ordered a pre-sentence report and set the case for further hearing as required by Section 13-11-3 and 13-11-4. The Court finds from the evidence presented upon the trial of the case, the sentence hearing before the same jury that heard the case and upon this sentence hearing before the court this day that the defendant committed the capital offense of nighttime burglary of an occupied dwelling when one of the occupants is intentionally killed by the defendant, Section 13-11-2(a)(4), Code of Alabama 1975.
The Court has considered the evidence presented upon the guilt-phase of the trial, and upon both sentence hearings as it pertains to aggravating and mitigating circumstances and finds that the only aggravating circumstance listed in Section 13-11-6 that exists and is applicable in this case is Section 13-11-6(4), which is, the capital felony was committed while the defendant was engaged in the commission of a burglary. This, then, is the only aggravating circumstance *1384 that was defined and given in the Court's charge to the jury upon the sentence hearing held before it and is the only one considered by the court in its determination of the sentence to be imposed in this case.
The Court did not limit evidence of mitigating circumstances to those listed in Section 13-11-7 but allowed the defendant to present evidence pertaining to any matter that might be relevant, probative and helpful to the jury and court in the sentencing phases of this trial. The court has considered evidence offered by the defendant in mitigation and has considered the evidence taken upon the trial and all arguments, and finds that the defendant has had three prior felony convictions in this court, therefore, the mitigating circumstance listed in Section 13-11-7(1) has not been established and is not applicable as a mitigating circumstance in this case. The court further finds that the mitigating circumstances listed under subsections (2), (3), (4), (5), and (6) have not been established by the evidence and are not applicable as mitigating circumstances in this case.
The only mitigating circumstance found to exist, considering all of the evidence upon the trial and at the sentencing hearings, is the one listed under subsection (7) of Section 13-11-7, which is, "The age of the defendant at the time of the crime." The defendant was 16 years of age at the time he committed the capital offense in this case.
The Court, in weighing the aggravating and mitigating circumstances finds that the mitigating circumstance found to exist due to the defendant's age, Section 13-11-7(7), is insufficient to outweigh the aggravating circumstance found to exist under Section 13-11-6(4), which is, "The capital felony was committed while the defendant was engaged ... in the commission of ... burglary..." and that the sentence to be imposed by it upon the defendant, Fredrick Lynn, should be death, and an order will be entered this day accordingly.
Dated this 31st day of May, 1983.
 /s/ Jack W. Wallace
 Jack W. Wallace, Judge
 Third Judicial Circuit of Alabama

ON REHEARING
TAYLOR, Judge.
In application for rehearing, Lynn contends that the death penalty is inappropriate in his case when compared with similar cases. This court and the Alabama Supreme Court have repeatedly upheld death sentences in cases of similar capital offenses. Clisby v. State, 456 So.2d 86 (Ala. Crim.App.1982), aff'd in part, rev'd in part, 456 So.2d 95 (Ala.), on remand, 456 So.2d 98 (Ala.Crim.App.), on remand, 456 So.2d 99 (Ala.Crim.App.), affirmed, 456 So.2d 102 (Ala.Crim.App.1983), affirmed, 456 So.2d 105 (Ala.1984) (nighttime burglary/intentional killing under Code of Alabama 1975, § 13-11-2(a)(4)); Kennedy v. State, 472 So.2d 1092 (Ala.Crim.App.1984) (nighttime burglary/intentional killing under Code of Alabama 1975, § 13A-5-31(a)(4)); Grayson v. State, 479 So.2d 69 (Ala.Crim.App.1984) (nighttime burglary/intentional killing under Code of Alabama 1975, § 13A-5-31(a)(4)); Lindsey v. State, 456 So.2d 383 (Ala.Crim. App.1983), affirmed, 456 So.2d 383 (Ala. 1984), (burglary/murder under Code of Alabama 1975, § 13A-5-40(a)(4)). We find that the death sentence is not inappropriate when compared with similar cases.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED;
All the Judges concur.
NOTES
[1] This section as it appeared in the Blue Paperback Pamphlet (adopted 1977, published 1978) is a recodification of § 13-11-2(a)(4), Code of Alabama (1975).